[No. B052727. Second Dist., Div. Five. July 22, 1991.]

KENNETH SCHILD et al., Plaintiffs and Appellants, v.
MICHAEL P. RUBIN, Defendant and Respondent.

COUNSEL

Moser & Ostling and James L. Moser for Plaintiffs and Appellants.

Michael P. Rubin, in pro. per., for Defendant and Respondent.

OPINION

BOREN, J.—Two neighbors, who happen to be lawyers, have bounced their unfortunate dispute from a basketball court into the courts of law. Respondent Michael Rubin successfully applied to the trial court for a permanent injunction to prohibit his neighbors, appellant Kenneth Schild and his wife (appellant Gail Schild), and any other person from playing basketball on the Schilds' property except during specified hours of the day. The trial court issued the injunction pursuant to the statute authorizing injunctive relief from willful harassment. (Code Civ. Proc., § 527.6.)[1] Because we find the

---

[1]Code of Civil Procedure section 527.6 provides, in pertinent part, as follows: "(a) A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order, and an injunction prohibiting harassment as provided in this section. [¶] (b) For the purposes of this section, 'harassment' is a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional distress

evidence in the present case does not establish all the requisite elements of section 527.6, we reverse and dissolve the injunction issued against the Schilds on July 23, 1990.

## FACTS

Kenneth and Gail Schild reside with their two children, 13-year-old Jonathan and 11-year-old Deborah, at their home on Alginet Drive in Encino. Michael and Yifat Rubin reside with their infant child at their home which is adjacent to the rear half of the Schilds' lot. An approximately six-foot-high solid adobe wall separates the two adjacent lots.

In December of 1987, the Schilds installed in the rear of their lot a basketball play area consisting of a metal pole and a standard backboard. The pole was set in a semicircular concrete area with a radius of approximately 15 feet from the pole. The pole and basketball backboard are approximately 55 to 60 feet from the wall which separates the two properties, and the Rubins' residence is at its closest point approximately 6 to 8 feet from the wall.

In January of 1988, Michael Rubin complained to the Schilds about the noise created by Jonathan Schild when he played basketball in the Schilds' backyard. The Rubins complained that the basketball playing interrupted Saturday and Sunday afternoon naps and, in general, interfered with their ability to rest and relax in their own home. The Schilds then poured additional concrete into the hollow cylindrical steel pole supporting the backboard and added four inches of foam rubber with plywood backing to the back of the backboard to deaden the sound of the basketball. Rubin admitted that the "sound projection was diminished somewhat by [those] corrective measures" but deemed the noise from basketball play still at "an unacceptable level."

According to Rubin, the Schilds, their children or guests played basketball or hardball catch on the basketball play area "3 to 5 times per week." A neighbor, Bradley Smith, who supported Rubin's claim of excessive noise stated that the area was used "two to three times per week." It was undisputed that the ball playing occurred for as short a period of time as five minutes to occasionally as long as thirty minutes. The basketball play area was not used before 9 a.m. or after 8 p.m. and was not used on school days

to the plaintiff. 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose. Constitutionally protected activity is not included within the meaning of 'course of conduct.' "

prior to 3:30 p.m. The basketball play area was used for varying lengths of time between 3:30 and 6:30 p.m. on weekdays and 12 p.m. to 12:30 p.m. and 4 p.m. to 6:30 p.m. on weekends. Usually, Jonathan Schild played basketball alone when he arrived home from school or played with his father upon his father's return home from work. The nearest public park is two and a half miles from the Schilds' residence.

On March 9, 1989, Rubin again complained of the noise from basketball playing and asked Jonathan to stop playing. Schild advised Jonathan that he could continue playing for another 10 minutes until dinner was ready because it would be dark and impossible to play later. Rubin demanded that Schild stop his son from playing basketball, became enraged, and then sprayed the basketball area with water from a garden hose. Rubin admitted that he directed the spray onto the basketball court area, claimed that no person was ever "directly sprayed," and deemed the spraying the exercise of his right to abate a "private nuisance." Schild and his son apparently got wet and considered the spraying an assault upon them.

On March 22, 1989, the Schilds filed a complaint against Rubin for assault, battery, trespass, nuisance and intentional infliction of emotional distress, and sought a permanent injunction. Rubin then cross-complained against the Schilds for nuisance and intentional infliction of emotional distress and also sought a permanent injunction. The actions were consolidated (Super. Ct. Case Nos. NWC046730 and NWC056871) and are apparently still pending trial as of the date of this opinion.

According to the Schilds and a neighbor, Joseph Burton, on several occasions between March 9 and March 31, 1990, unusually loud rock music emanated from the Rubins' residence and was directed at the Schilds' residence. During the times when the radio was on, the Schilds did not observe anyone in the Rubins' backyard or any cars in their driveway. The Rubins admitted playing the radio in their home but claimed it was not unusually loud. Neighbor Bradley Smith asserted that he never heard any music of any kind from the Rubins' residence while he was inside his own home across the street from the Rubins' residence.

On April 1, 1990, at approximately 12:30 p.m., a second basketball and hose spraying incident occurred. On April 2, 1990, the Schilds obtained a temporary restraining order against the Rubins. The order was thereafter modified and then followed by a petition for an injunction prohibiting harassment. On May 17, 1990, the court enjoined the Rubins from alarming, annoying or harassing the Schilds and their children and ordered that the Rubins "not direct communication of any kind, either oral, telephone, written or otherwise" to the Schilds or their children or guests and "not interfere

in any way with the peaceful use and enjoyment of [the Schilds' residence], including the full and appropriate use of the basketball play area." Rubin did not appeal the issuance of this injunction.

On June 7, 1990, Rubin obtained a temporary restraining order against the Schilds under authority of the willful harassment statute (Code Civ. Proc., § 527.6). Rubin sought a total ban on basketball play (as well as baseball catch). The court ordered the Schilds not to alarm, annoy or harass the Rubins and ordered that neither the Schilds "nor any persons on their property are to engage in any basketball playing or hardball catch activities except from 11 a.m. to 3:30 p.m. and from 4:30 p.m. to 6:30 p.m. daily." At the time of the temporary restraining order, Rubin's wife was pregnant and due to give birth on June 26, 1990. Rubin's wife's pregnancy was a major factor in Rubin's argument in support of a temporary restraining order.

On July 19, 1990, the court held a hearing on Rubin's application for a permanent injunction. The evidence before the court consisted of numerous documents submitted by counsel and limited supplemental testimony from Rubin. In addition to the facts as previously discussed herein, the documents submitted by counsel indicated the results of a study by Bruce Davy, an acoustical engineer retained by Rubin who tested several areas on the Rubins' property for ambient noise levels. Although Davy recorded no violation of the Los Angeles Municipal Code's noise regulations, he projected that based upon his findings, if three people played basketball on the play area, violations of the code noise level "would probably occur." Noise levels recorded near the center of the Rubins' bedroom were recorded with the window open approximately five inches. Rubin also submitted an unsworn real estate appraisal which alleged that the basketball playing on the Schilds' property devalued the Rubins' property 15 percent, reducing its value from $720,000 to $612,000.

The evidence submitted by the Schilds at the hearing included declarations from Clarence Massar, head of the Los Angeles Police Department's noise abatement team, Norman Simon, an architect, and T. C. Chung, an acoustical engineer. Massar criticized Davy's sound testing because of microphone placement and the briefness of his testing and set forth the results of his own sound tests, which found no code violations. Massar also questioned Davy's interpretation of the Los Angeles Municipal Code's noise regulations.

The declaration by Chung indicated that the noise levels inside the Rubins' bedroom could be substantially reduced by closing the windows. According to Simon, the noise levels could be further substantially reduced by installing thermal pane or dual glazed windows which "are not expensive

to install and represent an economic[al] solution to noise problems while improving the overall insulation of a structure."

After the court reviewed the evidence submitted at the July 19, 1990, hearing and heard the arguments of counsel, it granted Rubin's petition for an injunction prohibiting harassment, pursuant to Code of Civil Procedure section 527.6. The court ordered that the Schilds not alarm, annoy or harass the Rubins and that neither the Schilds "nor any other persons on their property, are to engage in basketball playing on their property of any kind except between 10:00 a.m. and 12:00 p.m.; between 2:30 p.m. and 5:30 p.m.; and between 7:30 p.m. and 8:30 p.m. daily."[2] The Schilds appeal.

## DISCUSSION

The Schilds correctly contend that substantial evidence does not support the injunction since evidence is lacking to support all the requisite elements of the willful harassment statute (Code Civ. Proc., § 527.6), which was the basis for the court's injunction. The noise from a ball and the verbal chatter by several people engaged in recreational basketball play in the residential backyard described herein, playing at reasonable times of the day for less than 30 minutes at a time and no more than five times per week, does not constitute unlawful harassment under section 527.6.

---

[2]The court also made the following apt observations: "It is the Court's conclusion that what is involved here is simply spiteful conduct on the part of the parties involved, that there is not and has not been an attempt to find a basis for neighborly accommodation between people living in relatively close quarters to each other as exists throughout the community. Instead what we have [are] lawyers utilizing their own unlimited resources to accelerate petty neighborhood squabbles into a community war. You have even involved your neighbors, and you have in that manner disturbed the tranquility of a whole neighborhood, people taking sides, one against the other. Families with children, who are raising children, should not really deal with each other in that fashion, especially when we have people who are educated, who are experienced in life, and who are faced with a situation where they recognize that everybody has rights to enjoy their home and their property with their family. [¶] I know that the Court has attempted on many occasions to bring you people to a point where the matter is resolved without taking advantage of the court system and using all of the time that you have used in this court. It appears to the Court and to the community . . . that the lawyers here are abusing the limited resources of the Court, which has a myriad of truly difficult matters pending before it crying out for resolution. These matters go back five years or longer, some of them, because they do not have court facilities to get to trial. [¶] Your situation, because you know how to do it, calls for priority treatment by the Court. And therefore, everything else that is before the Court is set aside to deal with your problems. Apparently you people have unlimited resources. . . . The lawyers' costs, the expert witnesses, the engineers, the fancy testing equipment, it is mind boggling that that kind of effort and that kind of money should be expended by all of you in this matter. [¶] You have by your conduct and by your position as lawyers embarrassed the Bar and the judicial system as a whole. You have subjected the whole system to ridicule and to public scorn. And many people, [including] your fellow practitioners, I believe would find this kind of conduct intolerable."

"In 1978 the Legislature enacted Code of Civil Procedure section 527.6, a special statute designed to afford protection against harassment. (Stats. 1978, ch. 1307, § 2, p. 4294.) This statute authorizes a 'person who has suffered harassment' to obtain a temporary restraining order and injunction against the harassing conduct and provides an expedited procedure to obtain such an injunction. [Citation.]" (*Diamond View Limited* v. *Herz* (1986) 180 Cal.App.3d 612, 616 [225 Cal.Rptr. 651], fn. omitted.) The legislative history reveals that the impetus for the statute was the intimidating experience suffered by a woman who was hounded day after day by a male admirer who constantly followed the woman, telephoned her incessantly and bombarded her with letters, clippings on parapsychology and strange, unwanted gifts. (*Id.* at p. 619.) The elements of unlawful harassment, as defined by the language in section 527.6, are as follows: (1) "a knowing and willful course of conduct" entailing a "pattern" of "a series of acts over a period of time, however short, evidencing a continuity of purpose"; (2) "directed at a specific person"; (3) "which seriously alarms, annoys, or harasses the person"; (4) "which serves no legitimate purpose"; (5) which "would cause a reasonable person to suffer substantial emotional distress" and "actually cause[s] substantial emotional distress to the plaintiff"; and (6) which is not a "[c]onstitutionally protected activity."

In assessing whether substantial evidence supports the requisite elements of willful harassment, as defined in Code of Civil Procedure section 527.6, we review the evidence before the trial court in accordance with the customary rules of appellate review. ■ We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value. (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925]; *Skyway Aviation, Inc.* v. *Troyer* (1983) 147 Cal.App.3d 604, 609 [195 Cal.Rptr. 281].)

■ At the heart of the present substantial evidence question are the related issues of whether the Schilds' conduct, in the language of Code of Civil Procedure section 527.6, "seriously" alarmed, annoyed or harassed the Rubins to the extent that the conduct "actually cause[d] substantial emotional distress" to the Rubins, and "would cause a reasonable person to suffer substantial emotional distress." Section 527.6 does not define the phrase "substantial emotional distress." ■ However, in the analogous context of the tort of intentional infliction of emotional distress, the similar phrase "severe emotional distress" means highly unpleasant mental suffering or anguish "from socially unacceptable conduct" (*Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 648 [257 Cal.Rptr. 865, 771 P.2d 814]), which entails such

intense, enduring and nontrivial emotional distress that "no reasonable [person] in a civilized society should be expected to endure it." (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397 [89 Cal.Rptr. 78, 47 A.L.R.3d 286]; see BAJI No. 12.73.) From our review of the record, we suspect that the bulk of any emotional distress suffered by the Rubins has been generated by the litigation in this case rather than by the noise from the Schilds' basketball playing.

The record, however, is sufficient to establish, as the Rubins and their neighbor Smith asserted, that the noise from the Schilds' basketball playing penetrated the air, offended "the senses" of the Rubins, invaded their "peace and quiet," and generally interfered with their "comfortable enjoyment of life and property." Specifically, the sounds of basketball playing interfered with the Rubins' ability to rest, sleep, relax, read, watch television and eat in their home and to converse in their backyard. ▇▇▇ Nonetheless, there is no medical, psychological or other evidence in the record that the sounds of basketball playing, however offensive and annoying, caused the Rubins "substantial emotional distress," within the meaning of Code of Civil Procedure section 527.6. Indeed, the Rubins specifically eschewed at trial the need for any medical or related evidence which might have established the requisite substantial emotional distress.

Even generously inferring from the facts, for the sake of argument, that the Rubins' emotional distress was substantial (see *Ensworth* v. *Mullvain* (1990) 224 Cal.App.3d 1105, 1110-1111 [274 Cal.Rptr. 447]), we conclude that the basketball playing in the time, place and manner as described which occurred prior to the restraining order and injunction would not "cause a *reasonable person* to suffer substantial emotional distress." (Code Civ. Proc., § 527.6, subd. (b), italics added.) A reasonable person must realize that complete emotional tranquility is seldom attainable, and some degree of transitory emotional distress is the natural consequence of living among other people in an urban or suburban environment. (*Fletcher* v. *Western National Life Ins. Co., supra,* 10 Cal.App.3d at p. 397.) A reasonable person must expect to suffer and submit to some inconveniences and annoyances from the reasonable use of property by neighbors, particularly in the sometimes close living of a suburban residential neighborhood. The Schilds' basketball playing occurred in a time, place and manner which constituted a reasonable use of their property. Accordingly, the Schilds' basketball playing was not so outrageous, extreme, intense or enduring as to come within the scope of injunctive relief for willful harassment pursuant to section 527.6.

▇▇▇ Although the injunction against the Schilds' basketball playing was premised on Code of Civil Procedure section 527.6 and not upon the legal

theory of nuisance, Rubin characterized the basketball playing as amounting to a nuisance and argued that a "nuisance is equivalent to harassment." Excessive and inappropriate noise may under certain circumstances constitute an interference with the present enjoyment of land amounting to a nuisance.[3] (See, e.g., *Wilson* v. *Interlake Steel Co.* (1982) 32 Cal.3d 229, 232 [185 Cal.Rptr. 280, 649 P.2d 922] [noise from steel fabricating plant adjacent to residences of retirees]; *Morton* v. *Superior Court* (1954) 124 Cal.App.2d 577, 581-582 [269 P.2d 81, 47 A.L.R.2d 478] [noise from rock quarry near residences]; *Wilms* v. *Hand* (1951) 101 Cal.App.2d 811, 816 [226 P.2d 728] [barking dogs in a dog hospital adjacent to a motel].) Nonetheless, not every activity which is "offensive to the senses [and] interferes with the comfortable enjoyment of life" (Civ. Code, § 3479) is a nuisance.

The Court of Appeals of South Carolina in *Blanks* v. *Rawson* (1988) 296 S.C. 110 [370 S.E.2d 890] addressed a situation somewhat similar to the present case where one neighbor alleged, in addition to several other complaints, a nuisance caused by the noise from the basketball playing of another neighbor. The court observed that the basketball playing was not a nuisance *per se* but could become a nuisance "by reason of circumstances, location, or surroundings." (*Id.* at p. 892.) As the court explained, "[T]he resolution of the issue of a private nuisance involves the conflicting interests of landowners. 'The right of one to make such lawful use of his property as he may desire must be applied with due regard to the correlative right of the other to be protected in the reasonable enjoyment of his property.' [Citation.] Each case must be decided upon its own facts, . . . '[E]very annoyance or disturbance of a landowner from the use made of property by a neighbor does not constitute a nuisance. The question is not whether the plaintiffs have been annoyed or disturbed . . . but whether there has been an injury to their legal rights. People who live in organized communities must of necessity suffer some inconvenience and annoyance from their neighbors and must submit to annoyances consequent upon the reasonable use of property by others.' [Citation.]" (370 S.E.2d at pp. 892-893.) ██ Our

---

[3] Civil Code section 3479 defines a nuisance as follows: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance"

Civil Code section 3502 provides as follows: "A person injured by a private nuisance may abate it by removing, or, if necessary, destroying the thing which constitutes the nuisance, without committing a breach of the peace, or doing unnecessary injury."

A civil action may also be brought to abate a nuisance. (Civ. Code, § 3501; Code Civ. Proc., § 731.)

view of the record in the present case compels the conclusion that there is no basis for Rubin's characterization of the Schilds' basketball playing as a nuisance.[4]

Since, as previously discussed, the evidence of Rubin's "substantial emotional distress" was insufficient and the Schilds' basketball playing occurred in such a time, place and manner that it would not "cause a reasonable person to suffer substantial emotional distress" (Code Civ. Proc., § 527.6, subd. (b)), we need not determine if the willful harassment statute is inapplicable to the present case for any other reasons. We thus do not determine whether substantial evidence established that the Schilds' basketball playing was, as required by the statute, "directed at a specific person" and "serves no legitimate purpose." (*Ibid.*) However, we note that Rubin admitted during his argument at trial that "basketball playing serves a legitimate purpose. It's exercise. It gets the family together . . . ."

It is also unnecessary to determine whether, as alleged by the Schilds, reasonable recreational basketball playing on one's own property is exempt from the purview of the willful harassment statute because such activity comes within the statute's exemption for "[c]onstitutionally protected activity." (Code Civ. Proc., § 527.6, subd. (b).) The Schilds allege that their basketball playing, done in a reasonable time, place and manner, reflects their legitimate exercise of the right to enjoy life, possess property, and pursue happiness and privacy, which are inalienable rights guaranteed by the California Constitution, article I, section 1. (Cf. *Smith* v. *Silvey* (1983) 149 Cal.App.3d 400, 406-407 [197 Cal.Rptr. 15] (Code of Civ. Proc., § 527.6 inapplicable where activities complained of were an exercise of the constitutional right to petition for redress of grievances).) Since we resolve this appeal on other narrower grounds, it is unnecessary to reach the Schilds' constitutional claim. (See *People* v. *Williams* (1976) 16 Cal.3d 663, 667 [128 Cal.Rptr. 888, 547 P.2d 1000].)

## DISPOSITION

The judgment is reversed, and the injunction issued against the Schilds on July 23, 1990, is dissolved. Each party is to bear its own costs on appeal.

---

[4]We note that the alleged devaluation of the Rubins' property may establish damages for a nuisance but is irrelevant to the willful harassment statute which protects people, not property. (See *Marquez-Luque* v. *Marquez* (1987) 192 Cal.App.3d 1513, 1517 [238 Cal.Rptr. 172]; *Diamond View Limited* v. *Herz, supra,* 180 Cal.App.3d at p. 618.)

Rubin's request to impose sanctions for a frivolous appeal is, of course, denied.

Ashby, Acting P. J., and Grignon, J., concurred.

Respondent's petition for review by the Supreme Court was denied October 30, 1991.