[No. D031878. Fourth Dist., Div. One. Nov. 12, 1999.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT SAMUEL EWING, Defendant and Appellant.

**COUNSEL**

Carl M. Hancock, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Esteban Hernandez

and A. Natasha Cortina, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**HALLER, J.**—Robert Samuel Ewing, appearing in propria persona, was convicted of stalking (Pen. Code,[1] § 646.9, subd. (a)) after a court trial. He was acquitted of trespassing (§ 602, subd. (n)). The trial court sentenced Ewing to two years in prison and issued a restraining order, pursuant to then section 646.9, subdivision (j), which prohibited Ewing from contacting the stalking victim for ten years.

Ewing appeals, contending the stalking statute is unconstitutionally vague, and there was insufficient evidence to support the conviction. We reject the first contention but agree the prosecution failed to establish the victim suffered substantial emotional distress. Accordingly, we reverse.

### FACTS

In November 1997, Rancella Ferguson was picking up her daughter at a downtown bus station. As Ferguson was leaving, she held open the door to allow Ewing to enter the station. Ewing told her it was the nicest thing anybody had done for him that day. Ewing and Ferguson struck up a conversation, and he asked whether she would be interested in assisting him in his magic show. Ferguson gave Ewing her phone number.

On January 30, 1998, Ewing performed a magic show at a fund-raiser for Ferguson's organization for battered women. Ewing also performed a magic show at the wedding of one of Ferguson's daughters in February.

In early March, Ewing asked Ferguson if he could store some of his equipment in her garage for two weeks. Ewing said he no longer could afford the rent at his storage facility and he expected to receive money within two weeks. Ferguson consented on the condition that Ewing store the equipment in her garage for only two weeks. Ewing later obtained Ferguson's permission to store his motor home on her property and to install in the garage a system to forward telephone calls to his cellular phone. At this point, Ferguson considered Ewing a friend and had a good opinion of him.

Ewing moved some of his belongings into Ferguson's garage. Ferguson did not give Ewing a key to the garage. It was her practice to unlock the

---

[1]All statutory references are to the Penal Code unless otherwise specified.

garage and let Ewing in when he needed something and to lock the garage when Ewing was finished.

The friendly relationship between Ewing and Ferguson began to turn sour. Ewing began appearing at Ferguson's residence early every morning to retrieve his props before going to work. He asked to use the restroom and for coffee, food and money. Ferguson told Ewing she did not like him asking for things. One day Ferguson was too busy to personally unlock the garage door for Ewing and asked one of her daughters to let him into the garage. The daughter handed Ewing a key to the garage; Ewing never returned the key. On another occasion, Ewing entered Ferguson's residence without knocking on her door; Ferguson told Ewing not to do it again. Rather than viewing him as a friend, Ferguson began to regard Ewing as a "very aggressive and pushy person" and was intimidated by him.

Ewing began telephoning Ferguson five to ten times a day, usually seeking money or food. Ewing made sexually suggestive comments in approximately 10 to 15 of the telephone calls. Ferguson asked Ewing not to make such telephone calls, but he continued to do so. Ewing also made sexually explicit comments to Ferguson in the presence of his girlfriend and Ferguson's boyfriend.

In early April, Ferguson discovered Ewing had set up a residence in her garage. Ewing had put in a bed, built shelves for his belongings and had hung magic show pictures. Ewing also had drilled a hole in the garage door, which faced the back door of Ferguson's residence. Removable black tape covered the hole from the inside. Ferguson had not given Ewing permission to live in the garage or make any changes to it. Ferguson decided Ewing should remove all of his things off her property.

Ferguson did not see Ewing for the two weeks before his arrest. When Ewing periodically telephoned, Ferguson would ask him: "When are you going to get your stuff out of my garage, you told me two weeks?" Ewing would assure her he was going to move his belongings, but Ferguson did not see him on the property.

On the evening of April 14, Ferguson and one of her daughters went to the home of an elderly couple, who also knew Ewing. Ewing was also there. When Ferguson repeated her demand that Ewing move his belongings because the two weeks were up, Ewing started yelling nonsensically. Ewing scared Ferguson.

Later that night, Ewing telephoned Ferguson and said he would not remove his belongings from the garage. Ewing was screaming at Ferguson.

Ewing also told Ferguson, who was a black belt in karate, "You think you know karate, I'll kick your ass." Ewing said Ferguson would have to evict him.

Ferguson was scared and telephoned 911. Ewing also telephoned the police and convinced them it was a landlord-tenant dispute. Accordingly, the police told Ferguson she would have to evict Ewing.

Chris Goulding, Ferguson's boyfriend, arrived after the police left. Goulding observed Ferguson was upset and concerned that Ewing was never going to leave. Then Ewing telephoned and started screaming at Ferguson. Ferguson and her children appeared terrified to Goulding. Goulding remembered Ewing had told him he was the type of person who would get even with anyone who wronged him.

The next morning (April 15), Goulding told Ewing to stop making telephone calls to Ferguson and repeated Ferguson's desire that he remove his belongings from her property. Ewing refused and contacted the police again, advising them he had "a reputation for assault and there's somebody in my garage right now . . . threatening me and if I kill him. . . ." Ewing claimed Goulding had grabbed him by the neck. In a later call, Ewing complained Ferguson had disconnected his telephone and electricity.

Ewing placed the following note on the garage door: "Rancella, the only one that I will [talk] to is your daughter['s] boyfriend. Anyone else that enter[s] here is here to hurt me. And I will not stand for that. You are dogging me and I want it to stop and leave [me] in peace."

On April 15, Ewing began videotaping Ferguson's residence and yard. He focused at various points on Ferguson's backyard window, zooming in and out, as Ferguson looked out the window briefly and then moved out of view of the video camera. Ferguson telephoned the police and reported Ewing was acting strange, and she did not know what he would do.

At some point on April 15, Ferguson sought and obtained a restraining order against Ewing because she was afraid for the safety of herself and her family, all of whom were scared. Ferguson's son wet his pants because of the videotaping by Ewing.

The next morning, Ewing vandalized Ferguson's yard and the garage. Ferguson called the police and asked for their assistance in serving the restraining order. Police arrested Ewing later that day because a television set and VCR were missing from Ferguson's garage. (Ewing said he had taken the two items to the repair shop.)

Ferguson was very shaken by Ewing's conduct. Her boyfriend testified she suffered sleepless nights, including one night during the trial, and joined a support group as a result.

*Defense*

Ewing denied harassing Ferguson and threatening her. Under an oral agreement between him and Ferguson, Ewing would live in her garage in exchange for working on her car and residence. They also were business partners. Ewing said he had been living in the garage since February 9, and Ferguson did not complain until April, when she became angry at him because she thought he was keeping $200 from her.

Ewing claimed his sexual comments to Ferguson were jokes and she never complained. Further, if Ferguson did not like his telephone calls, she should have had her telephone blocked, Ewing said.

On April 15, after his confrontation with Goulding, Ewing left Ferguson's garage and rented space at a storage facility. When he returned, he noticed the electricity and telephone line to the garage had been cut. Ewing telephoned the police. When the police arrived, he told them he wanted to move and was waiting for someone to bring him money. Ewing barricaded the door to the garage and jammed the lock to prevent Ferguson from removing his belongings while he was gone.

On April 16, Ewing unsuccessfully sought a restraining order against Ferguson.

DISCUSSION

### I.  *Constitutionality of Stalking Statute*

Section 646.9, subdivision (a), reads "Any person who willfully, maliciously, and repeatedly follows or harasses another person and who makes a credible threat with the intent to place that person in reasonable fear for his or her safety, or the safety of his or her immediate family, is guilty of the crime of stalking, punishable by imprisonment in a county jail for not more than one year or by a fine of not more than one thousand dollars ($1,000), or by both that fine and imprisonment, or by imprisonment in the state prison."

Ewing was not prosecuted for following Ferguson, but rather for harassing her. Section 646.9, subdivision (e), which defines "harasses," reads "For the

purposes of this section, 'harasses' means a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the person." Ewing contends the statute is unconstitutional because the terms "alarm," "annoy," "torment," and "terrorize" are impermissibly vague, to wit, they are subjective terms that do not provide adequate notice for an individual to avoid liability under the statute.[2]

*Legal Principles*

■ The constitutional guarantees of due process of law (U.S. Const., 14th Amend.; Cal. Const., art. I, § 7) require "a reasonable degree of certainty in legislation, especially in the criminal law . . . ." (*In re Newbern* (1960) 53 Cal.2d 786, 792 [3 Cal.Rptr. 364, 350 P.2d 116].) "[A] penal statute [must] define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." (*Kolender* v. *Lawson* (1983) 461 U.S. 352, 357 [103 S.Ct. 1855, 1858, 75 L.Ed.2d 903].)

■ In *Connally* v. *General Const. Co.* (1926) 269 U.S. 385. 391 [46 S.Ct. 126, 127, 70 L.Ed. 322], the United States Supreme Court articulated the "void for vagueness" doctrine as follows: "That the terms of a penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."

■ However, there is a presumption in favor of the constitutionality of statutes. As the Supreme Court noted in *Williams* v. *Garcetti* (1993) 5

---

[2]Previous challenges to the constitutionality of the stalking statute have been unsuccessful. In *People* v. *Heilman* (1994) 25 Cal.App.4th 391 [30 Cal.Rptr.2d 422], this court upheld the statute against a claim that the term "repeatedly" was unconstitutionally vague within the context of the statutory language. In *People* v. *Tran* (1996) 47 Cal.App.4th 253 [54 Cal.Rptr.2d 650], the court determined the phrase "serves no legitimate purpose," which is an element of the statutory definition of "harasses" contained in section 646.9, subdivision (e) was not unconstitutionally vague. In *People* v. *Falck* (1997) 52 Cal.App.4th 287 [60 Cal.Rptr.2d 624], the court upheld the statute in the face of a constitutional vagueness challenge concerning the term "safety." In *People* v. *Halgren* (1996) 52 Cal.App.4th 1223 [61 Cal.Rptr.2d 176], this court found the defintion of the term "credible threat" contained in section 646.9, subdivision (g) is not unconstitutionally vague.

Cal.4th 561, 568 [20 Cal.Rptr.2d 341, 853 P.2d 507], "The starting point of our analysis is 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively and unmistakably appears. [Citations.] A statute should be sufficiently certain so that a person may know what is prohibited thereby and what may be done without violating its provisions, but it cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' [Citation.]"

A court must view a statute from the "standpoint of the reasonable person who might be subject to its terms" and uphold the statute if its meaning is reasonably ascertainable. (*People* v. *Deskin* (1992) 10 Cal.App.4th 1397, 1400 [13 Cal.Rptr.2d 391].)

The requisite certainty can often "be fleshed out from otherwise vague statutory language by reference to," among other things, "long established or commonly accepted usage." (*Sechrist* v. *Municipal Court* (1976) 64 Cal.App.3d 737, 745 [134 Cal.Rptr. 733].)

*Analysis*

■■■ With respect to whether the statute is impermissibly vague, we ask the following question: Does section 646.9, subdivision (a), in conjunction with the definition of the term "harasses" contained in subdivision (e) of the statute, provide a "person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly"? (*Grayned* v. *City of Rockford* (1972) 408 U.S. 104, 108 [92 S.Ct. 2294, 2298-2299, 33 L.Ed.2d 222].)

We begin by noting each of the terms—"alarms," "annoys," "torments," and "terrorizes"—that Ewing claims is too subjective has a clear and understandable dictionary definition.

The definition of "alarm" is "to strike with fear: fill with anxiety." (Webster's New Internat. Dict. (3d ed. 1993) pp. 48-49.) "Annoy" is defined as "to irritate with a nettling or exasperating effect." (*Id.* at p. 87.) The definition of "torment" is "to cause (someone) severe suffering of body or mind: inflict pain or anguish on." (*Id.* at p. 2412.) The definition of "terrorize" is "to fill with terror or anxiety"; "terror" is defined as "a state of intense fright or apprehension." (*Id.* at p. 2361.)

Moreover, these terms as they appear in the statute cannot be read in a vacuum.

First, we note they are preceded and qualified with the adverb "seriously." Thus, the statutory definition of "harasses" contained in subdivision (e) refers to "a knowing and willful course of conduct directed at a specific person that *seriously alarms, [seriously] annoys, [seriously] torments, or [seriously] terrorizes* the person" against whom it is directed. (§ 646.9, subd. (e), italics added.)

Second, when the reasonable person standard (*People* v. *Deskin, supra,* 10 Cal.App.4th at p. 1400) is factored in, the statutory definition of "harasses" becomes "a knowing and willful course of conduct directed at a specific person that *[a reasonable person would consider as] seriously alarm[ing], [seriously] annoy[ing], [seriously] torment[ing], or [seriously] terroriz[ing]* the person." (§ 646.9, subd. (e), italics added.)

Third, section 646.9, subdivision (e), explicitly provides the "course of conduct must be such as would cause *a reasonable person to suffer substantial emotional distress,* and must actually cause substantial emotional distress to the person." (Italics added.) Thus, a reasonable person standard also applies to the victim, which eliminates the spectrum of possible subjective reactions by a targeted person to defendant's course of conduct.

The result is the stalking statute prohibits a course of conduct directed at a specific person that *a reasonable person would consider as seriously alarming, seriously annoying, or seriously tormenting a reasonable person.*

Given this context, the statutory definition of "harasses"—based on the four challenged words—is not uncertain.

Even if we consider the most subjective and least serious of the four challenged words—"annoys"—the word, given the context in which it is used, is "sufficiently certain to inform persons of ordinary intelligence of the nature of the offense which is prohibited." (*Smith* v. *Peterson* (1955) 131 Cal.App.2d 241, 250 [280 P.2d 522, 49 A.L.R.2d 1194].)

*People* v. *Beifuss* (1937) 22 Cal.App.2d Supp. 755 [67 P.2d 411] is instructive in that regard. At issue was the constitutionality of a city ordinance that provided: " 'No person shall be on any private premises or in any private house in a state of drunkenness or intoxication to the *annoyance* of any other person.' " (*Id.* at p. Supp. 756, italics added.) The court upheld the ordinance, interpreting it to contain a reasonable person standard and rejecting a construction that "would allow an annoyance to arise from the whim or fancy of some possibly unreasonable person." (*Id.* at p. Supp. 758.)

The *Beifuss* court relied upon the English case of *Tod-Heatly* v. *Benham* (1887) 40 Ch.D. 80, 94, which it summarized as follows: "That case

involved a covenant of a lease that the lessee would not do on the leased premises anything which might 'grow to the annoyance, nuisance, grievance, or damage' of the lessor or the inhabitants of adjoining houses. Construing this part of the lease, Lord Justice Cotton said: 'They [the judges] must decide not upon what their own individual thoughts are, but on what, in their opinion and upon the evidence before them, would be an annoyance or grievance to reasonable, sensible people; . . . It is not sufficient in order to bring the case within the words of the covenant, for the plaintiffs to show that a particular man objects to what is done, but we must be satisfied by argument and by evidence, that reasonable people, having regard to the ordinary use of a house for pleasurable enjoyment, would be annoyed or aggrieved by what is being done.' Lord Justice Lindley said (at page 96), 'Anything which raises an objection in the minds of reasonable men may be an annoyance within the meaning of the covenant. . . . more than some fanciful distaste, which would not be sufficient.' " (*People* v. *Beifuss, supra*, 22 Cal.App.2d at p. Supp. 757.)

■ As this court observed in *Smith* v. *Peterson, supra*, 131 Cal.App.2d at page 246, "It is not required that a statute, to be valid, have that degree of exactness which inheres in a mathematical theorem. It is not necessary that a statute furnish detailed plans and specifications of the acts or conduct prohibited."

■ The definition of "harasses" in section 646.9, subdivision (e), establishes a standard of conduct which is ascertainable by persons of ordinary intelligence. The language "conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." (*United States* v. *Petrillo* (1947) 332 U.S. 1, 8 [67 S.Ct. 1538, 1542, 91 L.Ed. 1877].)

There is no constitutional infirmity.

## II.  *Sufficiency of the Evidence*

■ Ewing contends his stalking conviction must be reversed because there was insufficient evidence of any of the elements of the offense. ■ " 'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]' " (*People* v. *Ochoa* (1993) 6 Cal.4th 1199, 1206 [26 Cal.Rptr.2d 23, 864 P.2d 103].)

■ The elements of the crime of stalking (§ 646.9) are (1) repeatedly following or harassing another person, and (2) making a credible threat (3) with the intent to place that person in reasonable fear of death or great bodily injury. (*People* v. *Carron* (1995) 37 Cal.App.4th 1230, 1238 [44 Cal.Rptr.2d 328].)

Beginning with the first element, we look at the statutory definition of "harasses," which is "a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, torments, or terrorizes the person, and that serves no legitimate purpose. This course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress *and must actually cause substantial emotional distress to the person.*" (§ 646.9, subd. (e), italics added.)

Section 646.9 does not define the phrase "substantial emotional distress," and we are unaware of any court opinion clarifying the meaning as the phrase is used in the statute. At the very least, we can safely assume that the phrase means something more than everyday mental distress or upset. In other words, the phrase "substantial emotional distress" entails a serious invasion of the victim's mental tranquility. After all, "[c]omplete emotional tranquility is seldom attainable in this world, and some degree of transient and trivial emotional distress is part of the price of living among people." (Rest.2d Torts, § 46, com. j, p. 77.)

We can also seek guidance from the similar phrase "severe emotional distress"—in the context of the tort of intentional infliction of emotional distress—which has been interpreted to mean distress " 'so severe that no reasonable [person] in a civilized society should be expected to endure it.' " (*Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 397 [89 Cal.Rptr. 78, 47 A.L.R.3d 286] [relying on comment j to section 46 of the Restatement Second of Torts, page 77].) The Court of Appeal in *Fletcher* went on: " 'The intensity and duration of the distress are factors to be considered in determining its severity.' It appears, therefore, that in this context, 'severe' means substantial or enduring as distinguished from trivial or transitory. Severe emotional distress means, then, emotional distress of such substantial quantity or enduring quality that no reasonable man in a civilized society should be expected to endure it." (10 Cal.App.3d at p. 397; see also BAJI No. 12.73.)

While the terms "substantial emotional distress" and "severe emotional distress" are similar, we do not view them as synonymous because "severe" is a stronger adjective than "substantial." Nonetheless, the interpretation of "severe emotional distress" is instructive in setting the measure for "substantial emotional distress."

In *Schild* v. *Rubin* (1991) 232 Cal.App.3d 755, 761-763 [283 Cal.Rptr. 533], the Court of Appeal considered an injunction issued under the willful harassment statute (Code Civ. Proc., § 527.6), which provides for injunctive relief from harassment.[3] Code of Civil Procedure section 527.6, subdivision (b) defines "harassment" in nearly identical language to the definition of "harasses" in section 646.9, subdivision (e), including the requirement that the "course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress" to the person. (See fn. 3, *ante.*) The *Schild* court relied on the meaning of "severe emotional distress" as used in intentional infliction of emotional distress cases to delineate "substantial emotional distress" for purposes of defining harassment under Code of Civil Procedure section 527.6, subdivision (b). (*Schild* v. *Rubin, supra,* 232 Cal.App.3d at pp. 762-763.) "[Code of Civil Procedure] [s]ection 527.6 does not define the phrase 'substantial emotional distress.' However, in the analogous context of the tort of intentional infliction of emotional distress, the similar phrase 'severe emotional distress' means highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' [citation], which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.' [Citations.]" (*Ibid.*)

Here, the prosecution presented only scant evidence of emotional distress. Ferguson testified that beginning the night of April 14 she feared Ewing; she was afraid for her own safety and that of her children. It was Ewing's conduct *that evening* that prompted Ferguson to make her first telephone call to the police department. Two days later, Ewing was arrested. Before the evening of April 14, there was no evidence that Ferguson feared Ewing.

Ferguson's boyfriend, Goulding, testified she suffered sleepless nights and had joined a support group for battered women. While this evidence supports the conclusion that Ewing's conduct upset Ferguson, it fell far short of showing Ferguson suffered substantial emotional distress. No evidence was

---

[3]Code of Civil Procedure section 527.6 provides, in pertinent part, as follows: "(a) A person who has suffered harassment as defined in subdivision (b) may seek a temporary restraining order, and an injunction prohibiting harassment as provided in this section. [¶] (b) For the purposes of this section, 'harassment' is . . . a knowing and willful course of conduct directed at a specific person which seriously alarms, annoys, or harasses the person, and which serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress and must actually cause substantial emotional distress to the plaintiff. [¶] . . . [¶] (3) 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose . . . . Constitutionally protected activity is not included within the meaning of 'course of conduct.' "

proffered as to the degree, frequency and duration of Ferguson's sleep disruption. Similarly, Goulding's statement Ferguson joined a support group, without further details as to the extent of her participation, adds little. Indeed, there was not even a showing that Ferguson, who had organized a foundation for battered women before meeting Ewing, joined the support group as a result of Ewing's conduct. Without evidence as to the severity, nature or extent of a victim's emotional distress, the burden of proof is not met.[4]

In sum, there was insufficient evidence that Ewing's conduct, however offensive and annoying, actually caused Ferguson to suffer "substantial emotional distress," within the meaning of section 646.9.

Since there was insufficient evidence of "substantial emotional distress," the prosecution failed to prove the "harasses" element of section 646.9. In light of this, it is unnecessary for us to address whether there was substantial evidence of the other elements of the crime.

DISPOSITION

Reversed.

Benke, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied December 2, 1999, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied February 16, 2000. Werdegar, J., was of the opinion that the petition should be granted.

---

[4]In a petition for rehearing, the Attorney General argues we have added an element to the crime of stalking. We have not. Rather, we have merely found the prosecution did not meet its burden of proof below.