Filed 8/26/21  D.M. v. K.C. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| D.M.,<br><br>            Plaintiff and Respondent,<br><br>v.<br><br>K.C.,<br><br>            Defendant and Appellant. | A161280<br><br>(San Francisco County<br>Super. Ct. No. CCH-20-582678) |

The trial court granted a civil harassment restraining order against K.C. pursuant to Code of Civil Procedure section 527.6[1] based on her conduct in an on-going dispute with her neighbors, D.M. and his wife A.M.[2]  K.C. appeals, arguing that her conduct could not reasonably have caused her neighbors to suffer substantial emotional distress and hence did not constitute harassment under section 527.6.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

We summarize the facts in the light most favorable to the judgment. (*Brekke v. Wills* (2005) 125 Cal.App.4th 1400, 1405 (*Brekke*).)  K.C. and D.M. are neighbors who live directly across the street from each other.  The parties

---

[1] All undesignated statutory references are to the Code of Civil Procedure.

[2] We refer to the parties and witnesses by their initials to protect their privacy.  (California Rules of Court, rule 8.90(b)(5)).

had no interactions prior to April 18, 2019.  At around 10:00 p.m., D.M. and A.M. were inside their home when they looked across the street and saw K.C. hit, shove, and slap her 12-year-old stepson in her kitchen.  A.M. also saw K.C. shove a plastic or glass bottle at her son, striking her son's face.  D.M. called Child Protective Services (CPS), who advised him to call the police.  While he was on the phone with the police, A.M. and a neighbor witnessed K.C. slap her son across the face.  D.M. and the neighbor ran across the street to stop her.  K.C. yelled at them stating: "You just stand [there] and judge me and yell at me.  I've lived with him for a year.  You don't know."  The police arrived.  When D.M. and the neighbor declined to press charges, the police advised them to contact CPS.  D.M. called CPS the next day.  Sometime afterward, K.C.'s husband, who was the boy's adoptive father, relinquished his parental rights of the child.  Later, an investigation with respect to K.C.'s daughter was dismissed and withdrawn by CPS.

Following this incident, K.C. had several hostile interactions with D.M. and A.M. which continued up until February 2020.  The first serious incident occurred on April 23, 2019.  A.M. was home alone when she heard a noise and checked her security camera.  She observed K.C. coming up to her front door yelling, "[f]ucking bitch, fucking home watching that [inaudible]. . . [¶]. . .You need some fucking help.  You're alone, bitch."  K.C. then rang the doorbell and stated "[i]s something wrong, you fucking cunt" before walking away.

At least five other incidents occurred over the next several months in which K.C. yelled expletives at D.M. or A.M. or both when they were outside their residence.  On May 6, 2019, as D.M. was opening his garage door to leave for work, K.C. yelled, "Have a good day, asshole!  Fuck you!  Who's looking after your baby while you are watching other people!"  On May 19, as D.M. returned home from a bike ride, K.C. yelled, "turn off the fucking T.V.

2

and talk." After a period of calm, appellant's hostility toward her neighbors reemerged. On November 16, 2019, D.M. was walking his dog and carrying his baby daughter on his chest when he encountered K.C., her husband, and their daughter on the street. K.C. shouted, "Oh wow, your TV shows have been cancelled fuckface" and continued yelling as D.M. walked away.

On December 16, 2019, A.M. returned home with her baby in the evening. She was seven months pregnant at the time. As she opened the garage door, K.C. yelled from across the street, "Fuckface over there … fucking bitch … so weird he's not faithful at all … he's never home … act like nothing to us … act like we never met … we're going to wait until the garage light is off." On January 6, 2020, K.C. yelled at A.M., "You fucking bitch!"

The final incident occurred on February 12, 2020. D.M. was exiting his driveway with his family in their vehicle just as K.C. and her daughter were coming out of their garage on their bicycles. K.C. entered the street and approached D.M.'s car yelling insults such as "[f]ucking white asshole. Fucking white fuckface!" Riding in the car with D.M. were his wife, mother-in-law, and baby daughter. D.M. believed that her actions almost caused a traffic accident. In K.C.'s version of events, she was riding her bicycle with her daughter when D.M. stopped at the stop sign for a long time without activating his turn signal. She admitted to calling him an "entitled fuckface" but claimed she was frustrated that D.M. had not indicated which direction he would turn, despite her efforts to make their presence known to him.

On March 30, 2020, D.M. filed a request for a civil harassment restraining order. He sought protection from K.C. for himself as well as for his wife and their two young daughters. He stated that his family was "unclear about [K.C.'s] mental stability and are fearful that she will escalate her verbal harassment to physical harassment if not further restrained." In

3

her response, K.C. denied many of D.M.'s allegations but admitted she had used foul language a few times. She complained that D.M. and A.M. were creating the animosity because they were constantly videotaping her family, watching them with binoculars, and causing their dog's daycare van to block their driveway. D.M. had also called CPS in October 2019 without justification to complain that she was harassing him when she was actually just socializing with her friends in her garage at that time. As to her conduct towards D.M. and A.M., she said she was merely venting her anger in response to their interference with her family.

At the July 30, 2020 hearing, D.M. testified that "ever since this night on April 18th when we saw this abuse, it has been nonstop harassment and very troubling for my wife and I who are trying to raise a daughter, and she's pregnant as well. Every time we go outside, something happens. We tried to mitigate it as much as possible by making sure they're not outside or what have you before we leave, but unfortunately, there's all these things that have happened. It's really shaken me; it's really shaken my wife and my daughters. And unfortunately, that's why we're here today." He indicated that the harassment had stopped after the trial court issued a temporary restraining order. Regarding the February 2020 incident, he stated that he was stopped at a four-way intersection with a two-way stop sign. He did not have his turn signal on because he was not going to turn left or right but was going to go straight across the intersection.

A.M. testified that "this past year should have been one of the best years of our lives," but because their family had seen something and reported it, "[K.C.] continued to harass us." A.M. explained that there had been about ten upsetting incidents since D.M. first contacted CPS, and A.M. was afraid of what K.C. might do in the future: "But you could continue to just get

4

triggered by us and you just – I don't feel safe.  I don't know if you have a gun; I don't know if you have a knife; I don't know if you're going to come over and start something.  Ran up my stairs and called me the "C" word?"  A.M. testified that the most upsetting moment was when K.C. rang her doorbell and called her the "C" word from outside the house.  A.M. could hear K.C. yell, "You're alone in there, bitch.  Just watching."  A.M. denied that she was constantly watching K.C. and her family.

K.C.'s husband I.C. testified that the police took his son to a youth crisis shelter the night of April 18, 2019, but he returned home the next day.  The following week, I.C. and his son argued and he told his son to leave the house.  His son went back to the crisis shelter.  I.C. blamed D.M. for causing his family to undergo two dependency court cases, one for his son and another for K.C.'s daughter.  He was frustrated because he felt that D.M. and his family were continually spying on them.

The trial court issued its ruling from the bench, as follows: "I found that [A.M.'s] testimony was particularly credible.  And there has been, I think, clear and convincing evidence of harassment.  [¶]  As to the issue of whether or not it's escalating or not, I think that [D.M.] is largely correct.  He makes the essential point which is that it's the temporary restraining order that has caused things to calm down.  [¶]  And so without an order in place, things may heat up again.  I think there's a good chance of that, if not a high probability of it.  [¶]  So on balance, I feel compelled to issue an order; however, I am only going to make the duration of it 18 months because I'm hoping that it will serve as a cooling-off period and that after that, things will resolve themselves where at least the parties can remain neutral to each other.

On August 7, 2020, the trial court filed its order prohibiting K.C. from harassing or contacting D.M. and his family and requiring her to stay 50 yards away from them (except only three yards when the parties are on their shared block). The order expires January 30, 2022. This appeal followed.

## II. DISCUSSION

### A. Applicable Law and Standard of Review

Section 527.6 authorizes a person who has suffered harassment to "seek a temporary restraining order and an order after hearing prohibiting harassment." (§ 527.6, subd. (a)(1).) The statute defines harassment as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be that which would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." (*Id.*, subd. (b)(3).) At the hearing on a section 527.6 petition, the judge "shall receive any testimony that is relevant, and may make an independent inquiry. If the judge finds by clear and convincing evidence that unlawful harassment exists, an order shall issue prohibiting the harassment." (*Id.,* subd. (i).)

"We review issuance of a protective order for abuse of discretion, and the factual findings necessary to support the protective order are reviewed for substantial evidence." (*Parisi v. Mazzaferro* (2016) 5 Cal.App.5th 1219, 1226, disapproved on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010, fn. 7.) " 'The appropriate test on appeal is whether the findings (express and implied) that support the trial court's entry of the restraining order are justified by substantial evidence in the record. [Citation.] But whether the facts, when construed most favorably in [the petitioner's] favor,

6

are legally sufficient to constitute civil harassment under section 527.6, and whether the restraining order passes constitutional muster, are questions of law subject to de novo review.' [Citation.]" (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 497.)

In evaluating a sufficiency of the evidence claim when the clear and convincing standard of proof is applied by the trier of fact, "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B., supra,* 9 Cal.5th 989 at pp. 995-996.)

## B.    Substantial Emotional Distress

K.C. contends the evidence does not support the issuance of a civil harassment order because the essential element of substantial emotional distress is lacking. She characterizes the incidents described above as "brief outbursts" and asserts that a reasonable person would not experience substantial emotional distress from her use of swear words.

Section 527.6 does not define the phrase "substantial emotional distress." However, in the analogous context of the tort of intentional infliction of emotional distress, the phrase "severe emotional distress" has been construed as highly unpleasant mental suffering or anguish " 'from socially unacceptable conduct,' " which entails such intense, enduring and nontrivial emotional distress that " 'no reasonable [person] in a civilized

7

society should be expected to endure it.' " (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762-763 (*Schild*); see also *Thing v. La Chusa* (1989) 48 Cal.3d 644, 648-649, [emotional distress is generally understood to include, among other emotions, fright, nervousness, anxiety, humiliation and worry].)

In arguing that there was insufficient evidence of substantial emotional distress, K.C. relies primarily on *Schild, supra. Schild* bears almost no resemblance to the present circumstances. Homeowners obtained a restraining order based on noise created by their neighbors' children playing basketball two to three times per week for up to thirty minutes each day during daylight hours. (*Schild, supra,* 232 Cal.App.3d at pp. 758.) The *Schild* court reversed, concluding that the mere sounds of basketball being played at reasonable times of the day did not constitute unlawful harassment under section 527.6. (*Id.* at p. 761.) The appellate court observed that even if the basketball playing had invaded the homeowners' peace and quiet, there was "no medical, psychological or other evidence" that such sounds caused them "substantial emotional distress." (*Id.* at p. 763). Nor would such basketball playing cause " 'a reasonable person to suffer substantial emotional distress' " under the statute because "some degree of transitory emotional distress is the natural consequence of living among other people in an urban or suburban environment." (*Ibid, italics omitted.*)

We are not dealing here with the innocuous sounds of children playing a game. The trial court received substantial evidence of K.C.'s harassing behavior directed at respondent, his pregnant wife, and other family members over a period of ten months. K.C. repeatedly accosted D.M. and A.M. with obnoxious, expletive-laden insults, doing so even in front D.M.'s infant daughter and K.C.'s own children. More alarming, K.C. went across the street and rang the doorbell screaming vulgarities at A.M. and stating

that she knew A.M. was home alone. In the February 2020 incident, she entered the roadway and confronted D.M.'s family in their vehicle, swearing at them as another car was approaching. We decline to equate K.C.'s purposeful and socially unacceptable behavior with the conduct at issue in *Schild*.

K.C. also cites *People v. Ewing* (1999) 76 Cal.App.4th 199, 212 (*Ewing*) and *People v. Brooks* (2017) 3 Cal.5th 1 (*Brooks*) for the proposition that the burden of proof for substantial emotional distress is not met without evidence of "medical or psychological treatment, support groups, sleepless nights, health problems, headaches, or evidence of anything [that] demonstrate[s] substantial emotional distress." We are not persuaded.

*Ewing* and *Brooks* are not section 527.6 cases, but instead address criminal convictions for stalking under former Penal Code section 646.9. Subdivision (e) of this former statute defined "harasses," in part, to require conduct " 'such as would cause a reasonable person to suffer substantial emotional distress,' and must actually cause substantial emotional distress to the person." In *Ewing,* the Court of Appeal held that the People failed to prove the "harasses" element of the statute because the prosecution presented only "scant evidence of emotional distress." (*Ewing, supra,* 76 Cal.App.4th at p. 211.) The *Brooks* court later cited *Ewing* for its conclusion that "evidence that the victim experienced sleepless nights and had joined a support group for battered women was insufficient to show that she suffered substantial emotion distress for purposes of establishing the stalking charge." (*Brooks, supra,* 3 Cal.5th 1 at p. 35.)

These cases are of limited value here. Criminal statutes are subject to proof beyond a reasonable doubt, while civil harassment under section 527.6 requires only clear and convincing evidence. (*Ewing, supra,* 76 Cal.App.4th

9

at p. 209; § 527.6, subd. (i); see also *Brekke, supra*, 125 Cal.App.4th at p. 1413 [noting that threatening behavior need not rise to the level of criminal conduct to be actionable under the anti-harassment statute].)  Furthermore, the only evidence presented in *Ewing* of the victim's emotional state was her testimony that she felt afraid for her safety two days prior to the defendant's arrest, and her boyfriend's testimony that she suffered sleepless nights and had joined a support group for battered women.  (*Ewing, supra,* 76 Cal.App.4th at p. 211.)  But without any evidence as to the degree, frequency or duration of her sleeplessness, such testimony was insufficient as a matter of law to support the criminal burden of proof.  (*Id.* at pp. 211-212.)  The *Ewing* court did not establish a requirement that a stalking charge requires proof of medical or psychological treatment or support group participation; the court was merely responding to the bare detail provided by the prosecution as to the victim's emotional distress.

In the present case, D.M.'s and A.M.'s substantial emotional distress was established by their testimony and video evidence and by reasonable inferences drawn from the evidence.  D.M. testified that the nonstop harassment had "really shaken me; it's really shaken my wife and my daughters."  He added that "[e]very time we go outside, something happens." Alone in her own home, A.M. had to listen to K.C. shout from her doorstep, "[Y]ou're alone, bitch. . . . Is something wrong, you fucking cunt?"  A.M. testified that she was afraid of what K.C. might do in the future.  She did not know if K.C. has a gun or a knife, or if K.C. was going to come over and do something.  Both were afraid to leave their home and sought to avoid K.C. when they went outside.  Even so, both experienced many other hostile encounters with K.C. over the next several months, and it did not matter that A.M. was seven months pregnant or that D.M. was carrying his infant

10

daughter on his chest. It is no great feat to imagine that a person capable of such openly hostile and unrestrained behavior might be capable of much worse. The evidence thus amply supports the trial court's implied finding that D.M. and A.M. experienced "highly unpleasant mental suffering or anguish" as a result of K.C.'s reprehensible conduct. (*Schild, supra*, 232 Cal.App.3d at p. 762-763.)

K.C. asserts that D.M. could not have suffered substantial emotional distress because he fueled the parties' animosity by reporting her to CPS in October 2019 and later by filing a police report. It is the trial court's task, not ours, to weigh conflicting statements, evaluate the credibility of witnesses, and ultimately make findings as to what occurred and whether K.C.'s conduct caused D.M. and A.M. substantial emotional distress. (See Code Civ. Proc., § 631.8, subd. (a) ["The court as trier of the facts shall weigh the evidence"]; *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 [appellate courts do not reassess witness credibility].) Based on the evidence presented, the court found that D.M. and A.M. "are in reasonable fear from you [K.C.]" and found clear and convincing evidence of harassment. In doing so, the trial court found A.M.'s testimony to be "particularly credible." We decline K.C.'s invitation to reweigh the evidence.

Finally, K.C. contends that even if D.M. and A.M. experienced subjective emotional distress, a reasonable person would not "suffer 'substantial emotional distress' as a result of a neighbor using cuss words occasionally." K.C. understates the severity of her conduct. The totality of the evidence summarized above fully supports the trial court's implied finding that K.C.'s course of conduct would cause a reasonable person to suffer substantial emotional distress, and that it did cause such distress to D.M. and A.M.

11

# III. DISPOSITION

The injunction issued pursuant to section 527.6 is affirmed.

_____

SANCHEZ, J.


We concur.


_____

HUMES,  P.J.


_____

BANKE, J.


(A161280)

13