[No. A098484. First Dist., Div. Three. Aug. 18, 2003.]

USS-POSCO INDUSTRIES, Plaintiff and Respondent, v.
EZELL EDWARDS, Defendant and Appellant.

## COUNSEL

Moore & Moore, Howard Moore, Jr., and Jane Bond Moore for Defendant and Appellant.

Cory S. Anderson for Plaintiff and Respondent.

## OPINION

**PARRILLI, J.**—"Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, ... may seek a temporary restraining order and an injunction on behalf of the employee prohibiting further unlawful violence or threats of violence by that individual." (Code Civ. Proc., § 527.8, subd. (a).)[1] ■ Here, we hold that an employer subjected to generalized threats of workplace violence may obtain relief under section 527.8 on behalf of an employee who is a logical target of the threats, even if the employee was not specifically identified by the harasser.

Ezell Edwards appeals from an order denying his motion to modify a section 527.8 injunction obtained by his former employer, USS-Posco Industries (UPI). Edwards, who was fired as a result of UPI's investigation of threats he made in the workplace, contends the court improperly issued an injunction protecting Edwards' supervisor in the absence of any evidence of a threat directed at her. He also challenges the sufficiency of the evidence to support the injunction. We affirm.

### BACKGROUND

Edwards was a mill worker at UPI's tin mill in Pittsburg. On March 19, 2001, Walter Rowell, a process manager, asked Edwards to wear his safety glasses. Edwards just looked at Rowell and walked away. About 40 minutes

---

[1] Further statutory references are to the Code of Civil Procedure.

later, Rowell came back through Edwards's department and noticed he was still not wearing his safety glasses. Rather than confront Edwards again, Rowell spoke to Larry Machado, Edwards's shift manager. Machado said he had already spoken to Edwards about his safety glasses earlier that day. Rowell then went to Lynette Giacobazzi, the department manager. Giacobazzi asked if Edwards was still not wearing his glasses. Rowell opened the door, and could see that he was not.

Giacobazzi went to speak with Edwards, who was wearing his glasses by the time she approached him. She told Edwards he would be disciplined if he did not wear his safety equipment. Edwards just looked at her without saying anything. Later that afternoon, toward the end of the shift, Edwards came to the office where Rowell was sitting, along with Machado and Tim DeWeerd, another manager. Edwards said, "Are you guys gonna follow me home? If you guys are so concerned about my safety, I think you ought to just follow me home. You guys should drive me home every day if you're so worried about my safety." Edwards was looking at Machado as he spoke, but then he turned to Rowell and said, "You know what time I get off. You know where the parking lot is at, and you know what time I'll be out there. We'll just go out there and take care of this." Rowell did not respond. Edwards turned and left.

Rowell felt threatened by Edwards's statement. Edwards frequently said he carried a gun. Edwards left work earlier than Rowell, and Rowell was concerned that Edwards might be waiting for him with a gun. Machado interpreted the statements as an invitation to fight. DeWeerd described Edwards's tone of voice as "definitely angry," but said it was not unusual for Edwards to talk that way. Rowell reported Edwards' statements to Giacobazzi. Giacobazzi asked if Rowell considered them a threat. He said he did. Giacobazzi spoke with Machado and DeWeerd, who confirmed the report and agreed that the statements were threatening "in an indirect way."

Giacobazzi contacted the union grievance representative, and set up a meeting for the following morning. When Edwards came in to work, he met with Giacobazzi and told her he had only been joking. Giacobazzi told him three people had taken him seriously. She suspended him for 5 days for violating UPI's policy against using threatening language toward a fellow employee.

Craig Pineda, a coworker of Edwards, became concerned when he heard about the incident with Rowell. He approached Machado at 9:30 on the morning of March 20 and said he had heard Edwards say some things that might be related to the threats against Rowell. At Machado's request, Pineda wrote down the following statements Edwards had made in the lunch room:

"The day I tell you to report off, you better, because I'm going to come in gunning. I'll shut the door of the office and let them fly."

"The day you see me with a lunchbox, because I don't use one, get the fuck out of the way because there's going to be a motherfucking gun inside."

"One of these days some motherfucker is going to piss me off and they're going to have to change the company's name from USS-POSCO to USS-Columbine."

"Don't let me get in trouble outside of this place cause I sure pay a visit to POSCO to take care of some motherfuckers before I go to jail."

Pineda testified that all these statements were made around March 2001.

Machado then asked another employee, Manuel Nino, if he had heard any disturbing comments from Edwards. He said he had, and wrote down that he had heard Edwards say "that if he was ever going to do something that he would let us know about it first and not to come to work the next day." Nino testified that Edwards said this in late February 2001. Nino had become concerned about Edwards because his temper had recently been getting shorter and shorter. Nino had heard statements from Edwards similar to those recorded by Pineda. Edwards had told Nino that he had a gun, and carried it in his car.

Machado gave the written statements from Pineda and Nino to Giacobazzi on March 22. Giacobazzi was shocked and concerned about her own safety and that of her coworkers. She thought Edwards might be upset about his recent reprimand and suspension, and feared he might try to retaliate against her or other UPI managers or employees. Giacobazzi passed the statements along to Michael Connally, the Labor Relations Manager at UPI. On March 23, Connally signed a petition seeking protective orders under section 527.8, requesting that Edwards be required to stay away from Giacobazzi and the UPI premises. The court granted a temporary restraining order.

Connally continued investigating, confirming the reports from Pineda and Nino. He also learned that an employee named Joe Lee had heard Edwards make comments about turning USS Posco into USS Columbine. An employee named Darin Smith reported that about two months prior to the Rowell incident, he heard Edwards say, "I carry a gun. I keep it in my car. I park my car outside of the [main employee] parking lot." Smith also overheard Edwards saying in the lunch room, in reference to UPI employees, "Sbranti, Connally, Dahlman, Golik, Rowell, I'll kill all the motherfuckers." When Smith sarcastically said "yeah, right," Edwards responded "I've got something for you, too."

UPI pursued termination proceedings and Edwards was fired.

Edwards filed no written response prior to the hearing on UPI's request for injunctive relief. (See § 527.8, subd. (f).) At the hearing on the injunction, Edwards denied making any statements like those reported by Pineda and Nino. He said he did not own a gun and never told anyone that he owned a gun. He claimed he had not meant anything by his comments in the office, had not directed them to anyone in particular, and had only been joking.

Giacobazzi testified that she was still concerned about retaliation from Edwards, particularly since he might blame Giacobazzi for firing him. Rowell testified that he was even more concerned about the threats from Edwards than he had been when they were made, in light of the other statements that came to light in the ensuing investigation. Pineda testified that he couldn't be sure whether Edwards was joking when he made his threatening statements, which is why they were so troubling. Smith testified that he was concerned about Edwards retaliating, "[s]o every time I leave I check the parking lot."

At the end of the hearing, the court asked for briefing on whether the statute authorized an injunction in the absence of a specific threat directed at a particular employee. In his brief, however, Edwards focused on whether his statements presented a credible threat, rather than whether section 527.8 authorized relief against generalized threats. UPI contended the statute was clearly aimed at preventing workplace violence, and it would be absurd to construe it not to apply to an employee who threatens the entire workplace.

On October 4, 2001, the court issued the three-year injunction authorized by section 527.8, subdivision (f), finding clear and convincing evidence of credible threats of violence by Edwards. The court said: "Now, the order is in the name only of the employee that it was [sought for] originally [Giacobazzi.] I know there has not been a direct threat naming her and I know there hasn't been any testimony of that; however, I believe that given the generalized threats, the threats about turning this into USS-Columbine, the other threats that had been talked about.... I believe that the order should be issued to her as his direct supervisor being the person that actually initiated disciplinary action in this case."

On December 20, 2001, Edwards moved to modify the injunction. He submitted declarations testifying that he had no history of violent conduct, and claimed that while he was well known as a "trash talker" he never took action and should not be taken seriously. He argued that such talk was common in the UPI workplace, and without any history of violent conduct he could not properly be restrained under section 527.8. The court denied the motion. This appeal followed.

## DISCUSSION

### 1. *Section 527.8 Does Not Require a Particularized Threat*

Edwards argues that because he made no threat directed specifically at Giacobazzi, section 527.8 did not authorize the issuance of an injunction protecting her. He emphasizes the statutory language providing that "[a]ny employer, whose *employee has suffered unlawful violence or a credible threat* of violence ... may seek ... an injunction *on behalf of the employee* ...." (§ 527.8, subd. (a); italics added.) We do not read the statute so narrowly.

"The fundamental purpose of statutory construction is to ascertain the intent of the lawmakers so as to effectuate the purpose of the law. [Citations.] In order to determine this intent, we begin by examining the language of the statute. [Citations.] But '[i]t is a settled principle of statutory interpretation that language of a statute should not be given a literal meaning if doing so would result in absurd consequences which the Legislature did not intend.' [Citations.] Thus, '[t]he intent prevails over the letter, and the letter will, if possible, be so read so as to conform to the spirit of the act.' [Citation.] Finally, we do not construe statutes in isolation, but rather read every statute 'with reference to the entire scheme of law of which it is part so that the whole may be harmonized and retain effectiveness.' [Citation.]" (*People v. Pieters* (1991) 52 Cal.3d 894, 898–899 [276 Cal.Rptr. 918, 802 P.2d 420]; accord, *People v. Ledesma* (1997) 16 Cal.4th 90, 95 [65 Cal.Rptr.2d 610, 939 P.2d 1310]; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332 [85 Cal.Rptr.2d 86] (*Scripps*).)

In *Scripps*, the court was concerned with the following sentence in section 527.8, subdivision (f): "If the judge finds by clear and convincing evidence that the defendant engaged in unlawful violence or made a credible threat of violence, an injunction shall issue prohibiting further unlawful violence or threats of violence." The respondent contended this provision entitles a plaintiff to an injunction if the court finds the defendant engaged in an act of unlawful violence, even if there is no showing of future harm. The court rejected this construction, though the express language of the statute appeared to support it. "[A] closer look at the subdivision within the context of the entire statute, its underlying legislative intent and the nature of injunctive relief, persuades us such a literal interpretation cannot be given to the disputed statutory language." (*Scripps, supra,* 72 Cal.App.4th at p. 332.)

"At the time section 527.8 was enacted, section 527.6 prevented harassment when there has been a knowing and willful course of conduct directed at a specific person which annoys or harasses the person and serves no legitimate purpose. The reasonable construction of this harassment provision

required the applicant to establish a course of conduct giving rise to a threat of future harm necessitating injunctive relief." (*Scripps, supra,* 72 Cal.App.4th at p. 333.)

"Section 527.8 was enacted in 1994 to establish parallel provisions to section 527.6. It authorized any employer to pursue a TRO and an injunction on behalf of its employees to prevent threats or acts of violence by either another employee or [a] third person. Given that section 527.6 only allowed injunctive relief for natural persons (see *Diamond View Limited v. Herz* (1986) 180 Cal.App.3d 612, 618–619 [225 Cal.Rptr. 651] []), section 527.8 was enacted to allow a corporate employer to bring such an action on behalf of an employee. Section 527.8 was thus intended to enable employers to seek the same remedy for its employees as section 527.6 provides for natural persons. The express intent of the author of the legislation was to address the growing phenomenon in California of workplace violence by providing employers with injunctive relief so as to *prevent* such acts of workplace violence. (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 68 (1993–1994 First Ex. Sess.) Aug. 31, 1994; Assem. Bill No. 68, Concurrence in Sen. Amends. (1993–1994 First Ex. Sess.) Aug. 31, 1994; Sen. Com. on Judiciary, Analysis of Assem. Bill No. 68 (1993–1994 First Ex. Sess.) as amended June 30, 1994.)" (*Scripps, supra,* 72 Cal.App.4th at pp. 333–334, italics in original, fn. omitted.)

Noting that section 527.8, subdivision (e) requires a showing of great or irreparable harm to obtain a temporary restraining order, the *Scripps* court concluded the same showing is required to obtain an injunction. It noted there was "no evidence of a legislative intent to alter the traditional nature of prohibitory injunctive relief" and a clear legislative intent to "provide employers with the remedy of injunctive relief to protect their employees by preventing unlawful violence where it is reasonably likely [to] occur in the future." (*Scripps, supra,* 72 Cal.App.4th at p. 335.)

Here, the terms of section 527.8, subdivision (a) provide less support for Edwards's position than the terms of subdivision (f) provided for the *Scripps* respondent. ▮ By authorizing an employer "whose employee has suffered unlawful violence or a credible threat of violence" to seek "an injunction on behalf of the employee," the Legislature did not specify that the threat of violence must be directed at a particular employee. Given the legislative intent to prevent workplace violence, it would indeed be absurd to read the statute in a way that would provide no protection against a threat to indiscriminately shoot employees on the premises. An employer may seek relief under section 527.8 on behalf of any employee who is credibly threatened with unlawful violence, whether or not that employee is identified by the defendant.

## 2. *The Evidence of Threats Was Sufficient*

Edwards raises a series of challenges to the sufficiency of the evidence to support the injunction. None are meritorious. ■ We apply the substantial evidence test, resolving all factual conflicts and questions of credibility in favor of UPI as the prevailing party, and drawing all reasonable inferences in support of the trial court's findings. (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762 [283 Cal.Rptr. 533].)

First, Edwards claims Giacobazzi's affidavit and testimony established only a subjective fear of violence, not an objective, credible threat. ■ However, this evidence included Giacobazzi's discovery of the statements reported by Pineda and Nino, in which Edwards repeatedly threatened to bring a gun into the workplace and shoot UPI employees against whom he harbored a grudge. It included the Rowell incident, in which Edwards reacted to a request that he wear his safety glasses by issuing a thinly veiled challenge to fight in the parking lot. Other evidence developed during Connally's investigation confirmed the threats, confirmed earlier reports that Edwards spoke of carrying a gun in his car,[2] and included an additional statement in which Edwards threatened to kill specific UPI managers. While Giacobazzi was not among the named targets, she certainly had objective reason to fear for her safety, as it was she who instigated the disciplinary action that led to Edwards's suspension and termination, and also to UPI's section 527.8 petition. Edwards's threats were consistently retaliatory in nature. There was ample evidence to support Giacobazzi's fear for her safety.

Next, Edwards contends his comments to Rowell were too vague and conditional to justify injunctive relief under section 527.8. He claims his statements were not "fighting words," and did not amount to a credible threat of violence in the mill environment, where boasting and threats were common. These arguments fail to account for the other, more serious threats reported by Edwards's coworkers. UPI did not seek an injunction based merely on Edwards's confrontation with Rowell.

Edwards also argues that his lunchroom statements were "stale" and did not provide the clear and convincing evidence of a credible threat of future violence required under section 527.8, subdivision (f) and *Scripps, supra,* 72 Cal.App.4th at page 335. He says no one who heard the remarks took them seriously. The record does not support these claims. The statements were made within a month or two of the Rowell incident and UPI's initiation of

---

[2] In his reply brief, Edwards claims there was no evidence to support the court's comment that the injunction was based partly on "[t]he fact that he said that he had a weapon and had brought it on before." However, more than one witness testified that Edwards said he had a gun and carried it in his car, which he drove to work.

section 527.8 proceedings. After hearing about Edwards confronting Rowell, Pineda was concerned enough that he came forward on his own to disclose the lunch room threats. Pineda was troubled because he could not tell whether Edwards was joking or not. Nino had become increasingly concerned about Edwards's inability to control his temper. Pineda and Nino were not personally threatened, because they were not targets of the threats and Edwards told them he would warn them before he did anything. But Darin Smith was concerned for his safety. The lunch room threats, the Rowell incident, and the reasonable concern that Edwards might retaliate for his suspension and termination provided clear and convincing evidence of a credible threat of future violence directed at Giacobazzi.

### 3. *Edwards Failed to Establish a Retaliatory Motive on UPI's Part*

On appeal, Edwards faults the trial court for failing to consider whether UPI's section 527.8 petition was motivated by a desire to retaliate against Edwards for his prior complaints about racial discrimination in the UPI workplace. However, Edwards never presented this argument to the trial court. He cites no authority requiring the court to take up the issue on its own initiative. In any event, while Edwards did present evidence that he had repeatedly complained about discrimination by UPI, there was no direct evidence of a retaliatory motive on UPI's part. Given the serious nature of the threats discovered by UPI management after the Rowell incident, there could have been no justification for denying injunctive relief based on an inferred retaliatory motive.

### 4. *The First Amendment Does Not Protect Edwards's Threats*

The injunction prohibits Edwards from making further threats of violence against Giacobazzi. He contends this restriction deprives him of his right to free speech under the federal and state constitutions. Again, Edwards failed to raise this claim below, and it is meritless in any case.

"[T]he state may penalize threats, even those consisting of pure speech, provided the relevant statute singles out for punishment threats falling outside the scope of First Amendment protection. [Citations.] In this context, the goal of the First Amendment is to protect expression that engages in some fashion in public dialogue, that is, ' "communication in which the participants seek to persuade, or are persuaded; communication which is about changing or maintaining beliefs, or taking or refusing to take action on the basis of one's beliefs ...." ' [Citations.] As speech strays further from the values of persuasion, dialogue and free exchange of ideas, and moves toward willful threats to perform illegal acts, the state has greater latitude to regulate expression. [Citation.]" (*In re M.S.* (1995) 10 Cal.4th 698, 710 [42

Cal.Rptr.2d 355, 896 P.2d 1365]; accord, *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 134 [87 Cal.Rptr.2d 132, 980 P.2d 846].) "[O]nce a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited 'prior restraint' of speech. [Citation.]" (*Aguilar v. Avis Rent A Car System, Inc., supra,* 21 Cal.4th at p. 140.) The same analysis applies under the California Constitution. (*Id.* at pp. 144–145.)

Edwards cannot seriously maintain that his threats to "come in gunning" at UPI furthered the values of dialogue protected by the First Amendment.

## DISPOSITION

The order denying modification is affirmed.

McGuiness, P. J., and Pollak, J., concurred.