Filed 3/29/13  Tri-City Healthcare Dist. v. Young CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### COURT OF APPEAL, FOURTH APPELLATE DISTRICT

### DIVISION ONE

### STATE OF CALIFORNIA

| | |
|---|---|
| TRI-CITY HEALTHCARE DISTRICT,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN YOUNG,<br><br>    Defendant and Appellant. | D059573, D059592, D059594 and D059595<br><br><br><br>(Super. Ct. Nos. 37-2010-00062910-CU-HR-NC, 37-2010-00062911-CU-HR-NC, 37-2010-00062912-CU-HR-NC and 37-2010-00062913-CU-HR-NC) |

CONSOLIDATED APPEALS from orders of the Superior Court of San Diego County, Harry L. Powazek, Judge.  Affirmed.

Tri-City Healthcare District (Tri-City) petitioned for protective orders against Dr. John Young on behalf of four of its employees.  (Code Civ. Proc.,[1] § 527.8.)  After an evidentiary hearing, the court issued orders enjoining Dr. Young from further contact with the four employees and prohibiting Dr. Young from entering Tri-City's hospital (except for emergency purposes).  The court additionally provided a procedure whereby

---

[1]    All further statutory references are to the Code of Civil Procedure.

Dr. Young could participate in hospital board meetings without being physically present at the hospital.

On appeal, Dr. Young raises numerous contentions, including:  (1) insufficient evidence supported the need for the section 527.8 protective orders; (2) the court failed to apply proper legal standards and proof burdens; (3) Tri-City sought the orders for an improper purpose; and (4) the protective orders violated his First Amendment rights to attend governmental board meetings.  The contentions are without merit and we affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

*Background*

Tri-City is a subdivision of the state and operates a hospital, Tri-City Medical Center (Hospital), in Oceanside, California.  Tri-City is governed by a publicly elected board of directors (the Board).  Dr. Young, a cardiothoracic surgeon, previously practiced at the Hospital.  In 2009, Tri-City revoked Dr. Young's medical privileges based on a finding that he had engaged in disruptive, unprofessional behavior.  Dr. Young's mandamus petition challenging the revocation is pending in the superior court in a separate action (mandate action).

On December 13, 2010, Tri-City filed four section 527.8 petitions seeking to enjoin Dr. Young from having any further contact with four specified employees, alleging that Dr. Young had a long history of disruptive and intimidating behavior and recently Dr. Young's "harassing, violent, and erratic behavior" had escalated, particularly at Tri-City's monthly Board meetings.  The four employees were: (1) Matthew Soskins,

2

Tri-City's in-house counsel; (2) Larry Anderson, Tri-City's chief executive officer (CEO) and Board member; (3) George Coulter, a Board member; and (4) Jami Piearson, Tri-City's director of regulatory compliance and quality.

Tri-City sought the protective orders because the "employees feel threatened and frightened by Dr. Young." In support, Tri-City submitted lengthy declarations from each of the four employees detailing incidents in which Dr. Young engaged in erratic and threatening behavior. Tri-City also submitted the declarations of two security officers who witnessed some of the incidents. After reviewing the petitions and supporting declarations, the court granted temporary restraining orders.

The court thereafter held a two-day evidentiary hearing regarding Tri-City's request for permanent (three-year) restraining orders. At the hearing, Tri-City presented testimony of the four employees for whom Tri-City sought protection and Tri-City's security director (Craig Lawyer), who testified as a percipient and expert witness. Dr. Young testified on his own behalf, but did not call any other witnesses and did not present any documentary evidence.

The following summarizes the evidence presented at the section 527.8 hearing. Under well-settled appellate rules, we summarize the relevant evidence in the light most favorable to the prevailing party and assume all credibility disputes were resolved in Tri-City's favor. (*USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 444 (*USS-Posco*).)

*Dr. Young's Pre-2010 Actions*

In 2004 or 2005, Dr Young frequently harassed hospital staff members by saying things that were "derogatory," "intimidating," "bully-like," and "threatening." One of the employees was extremely distraught "to the point where she was in tears."

In 2007, Piearson was the medical staff office director, whose responsibilities included peer review issues. Shortly before Dr. Young's disciplinary proceedings began that year, Dr. Young came to Piearson's office to review patient records. Dr. Young was highly agitated and made loud humming noises. As he was leaving the area, Dr. Young became "overtly threatening," and said words to the effect that he was going "to take out or take down the medical staff" and that "he knew things about [Piearson] that he bet [she] wish[ed] he didn't."

During the peer review hearings, Dr. Young would "very frequently yell at people, storm out of the room, [and] threaten people." The hearing officer had to instruct Dr. Young "to stop making racial slurs and swearing." At one point during the hearings, Dr. Young said he knew where Piearson parked and that she "needed to be careful." After this remark, the hearing officer stopped the proceedings and requested security guards to come into the hearing. Dr. Young also later told Piearson, "I know where you live."

Piearson interpreted these comments as threats and became highly concerned for her safety and her staff was "frightened and very fearful." In response to these concerns, Tri-City installed locks, panic buttons, and surveillance cameras in the medical staff office. Tri-City also gave Piearson a more secure parking space.

4

When Dr. Young saw the new security measures, he asked Lawyer about them. Lawyer told Dr. Young the measures were taken because of him. Dr. Young responded: "Well, maybe I can just take you outside and kick your ass." Lawyer did not believe this was "a jovial comment."

In January 2009, Tri-City hired Anderson as CEO. Shortly after, Anderson was told by the medical chief of staff that "his [the chief of staff's] life had been threatened directly by Dr. Young."[2] Piearson also told Anderson about similar threats from Dr. Young.

*Dr. Young's Conduct at 2010 Board Meetings*

Each of the four protected employees regularly attend Tri-City's monthly Board meetings held at the Hospital. Anderson and Coulter are Board members; Soskins is Tri-City's in-house counsel; and Piearson is required to attend many Board meetings to answer questions. The meetings frequently last between three and six hours.

Dr. Young had a long history of engaging in frequent outbursts during Board meetings, saying things such as "that's bullshit" or "no" and would also grunt, try to speak out of turn, and intimidate. Additionally, Dr. Young appeared to be drunk at many meetings. He smelled of alcohol; his speech was "a bit slurred"; and "his balance was a bit off." Dr. Young could not sit still. He would get up, move around, fidget, and change

---

[2] Although this evidence was hearsay, a court has the discretion to consider hearsay evidence in a section 527.8 proceeding. (*Kaiser Foundation Hospitals v. Wilson* (2011) 201 Cal.App.4th 550, 558.)

seats. Dr. Young would also "rant," claiming conspiracy theories regarding the revocation of his privileges.

At the August 2010 board meeting, there was a confrontation between Dr. Young and CEO Anderson and Board member Coulter. Dr. Young acted in a verbally and physically threatening manner towards Anderson and Coulter, and security director Lawyer was concerned for the physical safety of Anderson and Coulter. Lawyer and several other security officers intervened to protect Anderson and Coulter, and then escorted Dr. Young out of the meeting. As he was being escorted out, Dr. Young said to Anderson words to the effect of "'maybe I need to bring a gun or plant a gun here to get some respect.'"

At the next Board meeting in September 2010, Dr. Young approached in-house counsel Soskins, tapped him on the shoulder, and said he knew Soskins because he had worked with the "Coppo" law firm (DiCaro, Coppo & Popcke) that had represented Tri-City in Dr. Young's mandate action. Although Soskins had previously worked for this law firm, Soskins did not respond directly because he was afraid for his personal safety based on Dr. Young's prior behavior at Board meetings. Soskins told Dr. Young he did not want to interact with him, and asked him to "[c]ease and desist." However, during a break, Dr. Young followed Soskins into the restroom, and began talking loudly to Soskins and blocked Soskins's path to the sink and to the exit. Soskins was very concerned for his safety because of Dr. Young's history of erratic behavior and the fact that there appeared to be "a crazy, drunk person who is blocking me from leaving and saying things fairly loudly to me." Later during the Board meeting, Dr. Young told

6

Lawyer that Soskins "looks like a skinhead Nazi." At the end of the meeting, Lawyer "escorted [Dr. Young] off the property."

At the next Board meeting in early November 2010, Dr. Young again approached Soskins, touched his arm and began "berating" him. Dr. Young told Soskins that "he was going to get" him and called Soskins a " 'crypto-Nazi skinhead, bullshit artist, full of shit, fucking Nazi, fascist.' " Soskins responded by telling Dr. Young not to touch him again and repeatedly stated "[c]ease and desist." Soskins was very scared and was afraid that Dr. Young was going to attack him. Dr. Young continued to swear and call him names until Soskins got Lawyer's attention. When Lawyer approached, Dr. Young walked away. Thereafter, during a break, Dr. Young moved his chair back a few feet, and glared at Soskins for the next hour.

*Security Director's Testimony*

Lawyer testified at the section 527.8 hearing as a percipient witness and a security expert. Lawyer served as a security officer for the Hospital for about 10 years, and before that had been a law enforcement officer with the Los Angeles Police Department for about 20 years. Lawyer regularly attended Board meetings and also knew Dr. Young when he worked as a physician in the Hospital.

Lawyer testified that Dr. Young engaged in 'highly aggressive" behavior at Board meetings and that Dr. Young had substantial "impulse-control" problems. Lawyer said Dr. Young would repeatedly make inappropriate comments concerning safety issues. For example, Dr. Young would regularly ask Lawyer: "Are you going to search me tonight?" He would also frequently bring a bag with him and make comments like "I could have a

7

knife in there." At one Board meeting, Dr. Young told Lawyer, "I could have a KA-BAR knife," which Lawyer said was a "combat" or "fighting" knife used by Marines.

Lawyer did not interpret these comments as jokes. Lawyer indicated that the comments raised concerns about whether Dr. Young was attempting to understand the search procedures in the event Dr. Young decided to bring a weapon into the Hospital.

After Dr. Young's privileges were revoked, Lawyer saw a substantial change in Dr. Young's behavior. Dr. Young previously came to Board meetings professionally dressed. Now, he looked "disheveled." Based on the "downward trend" in Dr. Young's personality and appearance and the escalation of his aggressive behavior, Lawyer considered Dr. Young a potential "security risk." Lawyer explained that Dr. Young's actions and decline in his personal appearance were indicative of a "cycle of violence" as it relates to "workplace violence issue[s]." Based on his experience and observations, Lawyer said that Dr. Young's behavior appeared to be progressive and could potentially lead to aggression and violence.

Lawyer opined that Dr. Young presents a safety concern for the four Tri-City employees seeking protection and that a restraining order is "absolutely" necessary to protect those employees. Lawyer said he was familiar with the recent shooting at a Florida school board meeting and was concerned the same thing would happen at a Tri-City Board meeting.

At the section 527.8 hearing, each of the employees for whom Tri-City was seeking a protective order testified they were fearful of Dr. Young and concerned he would commit violent acts against them.

Anderson said he is "very much" concerned for his own safety and that "in most every encounter that you have with Dr. Young, he attempts to intimidate you." Dr. Young would "invade your space," meaning that he would "get closer to you than a normal person would," and would sometimes raise his voice. Anderson repeatedly told Dr. Young to back off, but Dr. Young would not comply with these requests.

Coulter similarly testified that he feared for his safety and was concerned that Dr. Young might act out violently toward him in future meetings. Coulter said it is "not possible to walk past Dr. Young without him making some derogatory remarks." Coulter testified that he felt "harassed" and "threatened" by Dr. Young's conduct.

Soskins testified that based on Dr. Young's conduct and statements, he was in substantial fear for his personal safety, and stated: "I'm concerned any time I'm near him. I'm concerned about him coming to work and shooting the place up. I'm concerned about him coming to my office, my home . . . I just don't want to interact with him."

Piearson also testified that she was concerned for her safety when she was required to attend Board meetings, and was concerned that Dr. Young would follow her home after the meetings.

The court also reviewed the declaration of Richard Crooks, a security officer responsible for maintaining a secure environment in the Board meeting room. Crooks

9

has 30 years experience in public and private law enforcement and is a former detective with the Oceanside Police Department. Crooks stated that during the eight months of Dr. Young's disciplinary proceedings, Dr. Young engaged in increasingly erratic and outlandish behavior. Dr. Young would yell and scream during and after the proceedings. Crooks also said Dr. Young's conduct at the Board meetings was "very disruptive" and "explosive." He further stated: "I have been profiling security threats in crowds for the entirety of my 30-year career. As such, I have the expertise to easily assess and identify individuals who pose security threats. Every time I see Dr. Young, red flags are immediately raised. In my opinion, he is a security threat who compromises the safety of the hospital board meetings. As a result of my knowledge of Dr. Young's past harassing and threatening conduct toward board members and hospital staff, I am very concerned Dr. Young will act out violently toward a board member, and especially a Tri-City Medical Center staff member, without warning."

*Dr. Young's Conduct at Section 527.8 Hearing*

At the section 527.8 hearing, Dr. Young (who appeared in propria persona) frequently failed to comply with the court's directions. Additionally, an incident occurred during a recess that impacted the court's evaluation of the issues. Shortly after Anderson finished his testimony, the court took a break. Coulter was standing outside waiting to testify, and Coulter saw Dr. Young "look[] at [Anderson] and [Dr. Young] smacked . . . his fist into his hand." When Coulter began his testimony, Tri-City's counsel asked Coulter about this incident and asked him to demonstrate how "hard" Dr. Young slammed his fist into his hand. Coulter complied. Although the record does not show the

10

precise nature of this action, it is clear from the court's remarks that Coulter's demonstration of Dr. Young's action was accompanied by significant force.

*Dr. Young's Defense*

Dr. Young did not present any witnesses or documentary evidence, and instead relied solely on his own testimony. He testified in narrative form for more than one hour. The following summarizes the relevant portions of his testimony.

Dr. Young testified that the declarations filed by each of the four employees were "almost completely false." Dr. Young said he had never hit anybody with his fists since first grade and did not own a gun or a KA-BAR knife, though he said, "I know lots of people who do," including members of his own family. He said that he is a good father to four children and has been married for a lengthy time and does not drink alcohol.

With respect to the August 2010 incident involving Anderson and Coulter, Dr. Young said the incident arose from his attempts to defend another Board member and claimed that he was legally entitled to engage in the confrontational conduct. He said his verbal dispute with Coulter lasted "no longer than maybe a minute and a half." Dr. Young testified that Anderson is a "legal thug" who is unqualified for the CEO position and that Anderson had made defamatory statements against him. Dr. Young said he had only "two face-to-face contacts" with Anderson.

Dr. Young did not specifically deny making the various threatening statements to Piearson, but claimed that Piearson "is involved up to her eyeballs in fraud." With regard to his interaction with Soskins, Dr. Young denied any threatening behavior in the restroom. He did, however, acknowledge continuing to confront Soskins after he was

11

asked to "[c]ease and desist" and telling him "the guys that you are working with are crypto-Nazi skinheads."

Other than these brief explanations, Dr. Young devoted most of his testimony to discussing the charges against him leading to the termination of his medical staff privileges, and in challenging the grounds for those charges. Dr. Young acknowledged that he can be "intimidating" and has engaged in "disruptive" behavior, but suggested his conduct was appropriate because of the peer review proceedings and the fact that "hospitals are political places."

*Court's Conclusions and Orders*

After considering the parties' evidence and argument, the court found a sufficient basis to issue the three-year restraining orders. The court noted that although many of the allegations were "dated," the evidence showed a "consistent pattern of over-the-top behavior," by Dr. Young that created "real safety concern[s]" for the four employees. The court emphasized the uncontroverted evidence that Dr. Young repeatedly discussed weapons with the security officers and the "fist-pumping" incident during the hearing.

But the court recognized that Dr. Young had constitutional rights to participate at public Board meetings and expressed concern that a blanket stay-away order would violate these rights. The court thus asked the parties to provide supplemental briefing on the manner in which the court could impose protective orders with reasonable limitations "so [Dr. Young] could attend these meetings" held at the Hospital.

Tri-City submitted a memorandum recommending that the court provide Dr. Young the opportunity to participate in the Board meetings "via speaker phone," which

12

would allow him to hear the proceedings and speak during the public comment period after emailing a request. Tri-City asserted that under these procedures, "Dr. Young can follow the [Board] proceedings in real time and participate as desired." Tri-City said it "has this technology already in place and therefore this solution would be simple to implement." Tri-City claimed the restraining orders could not be effectively enforced if Dr. Young personally attends Board meetings because of the relatively small size of the Board meeting room, the length of the meetings, and the various entrance and exit times of the affected employees and Dr. Young.

Dr. Young's supplemental briefing consisted primarily of his arguments as to why the court should not grant Tri-City's requested protective orders. He also urged the court to allow him to personally attend Board meetings after security officers check him for weapons, and "smell his breath and make him walk a line."

The court's final order stated in relevant part:

> "[Dr. Young] has the right to appropriately participate at [Tri-City's] public [Board] meetings . . . and had done so on a regular and consistent basis. [¶] However, [this court has granted a restraining order] . . . based upon [Dr. Young's] conduct toward each of the [four employees]. Said conduct included, but was not limited to, personal touching, stalking around the hearing room, confrontations in the restrooms, and discussions as having/obtaining weapons. This conduct generally resulted in the calling of hospital security and [Dr. Young] being escorted off the hospital premises.

> "Additionally, in issuing the orders, the court had taken into consideration [Dr. Young's] conduct during the hearing which was concerning. Said conduct included, but was not limited to, his difficulty in complying with the court's instructions and guidance.

> "[Tri-City has] . . . provided credible evidence as to the escalation of [Dr. Young's] conduct during these meetings as well as his 'fist

13

pounding' exhibited to [the employees] while exiting the courtroom during one of the breaks.

"Based on the above, it is not appropriate for [Dr. Young] to be personally present at Tri-City Hospital during the Board . . . meetings.

"[Tri-City's] suggestion as to the utilization of an electronic means including, but not limited to, the use of a speaker phone is well founded, appropriate, and would allow respondent to participate in the meetings on a real time basis.  If he chooses to utilize this procedure, he must abide by the current procedures and rules and provide notice to the [Board] through email.

"[Dr. Young] shall not personally be present at the . . . Hospital except for an emergency basis . . . .  He is to provide written notice to counsel through e-mail at least ten days prior to the [Board] meeting at which time counsel shall provide the dial-in number which respondent may utilize in his participation in the [Board] meeting.  Counsel shall provide to [Dr. Young] within ten days of the date of this correspondence the e-mail address which [he] may utilize in providing the notice as set forth above. . . ."

The court then issued three-year restraining orders, which included personal conduct orders, weapons restrictions, and orders requiring Dr. Young to stay 100 yards from each of the four employees (and their homes) and from the Hospital (except for emergency purposes).  Each order also details specific procedures identifying the manner in which Dr. Young may participate in Board meetings through a two-way speaker phone, which includes his right to speak during the public comment period and listen to each entire Board meeting.

14

DISCUSSION

## I. *Generally Applicable Legal Principles*

Section 527.8 "authoriz[es] any employer to pursue . . . an injunction on behalf of its employees to prevent threats or acts of violence by either another employee or third person." (*Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 333.) Section 527.8 was "intended to enable employers to seek the same remedy for its employees as section 527.6 provides for natural persons." (*Id*. at pp. 333-334.) "The express intent of the author of the legislation was to address the growing phenomenon in California of workplace violence by providing employers with injunctive relief so as to *prevent* such acts of workplace violence." (*Id.* at p. 334; accord *Huntingdon Life Sciences, Inc. v. Stop Huntingdon Animal Cruelty USA, Inc.* (2005) 129 Cal.App.4th 1228, 1258 (*Huntingdon Life*).)

Specifically, section 527.8 states: "Any employer, whose employee has suffered unlawful violence or a credible threat of violence from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a temporary restraining order and an injunction on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace . . . ." (§ 527.8, subd. (a).) If there is good cause to grant the petition, the court must hold a hearing and "receive any testimony that is relevant and may make an independent inquiry." (§ 527.8, subd. (j); see 527.8, subd. (h).) "If the judge finds by clear and convincing evidence that the [defendant] engaged in unlawful violence or made a credible threat of violence, an injunction shall issue prohibiting further unlawful violence

15

or threats of violence." (§ 527.8, subd. (j).) A section 527.8 protective order must be limited to a three-year period and cannot be issued if it "prohibit[s] speech or other activities that are constitutionally protected . . . ." (§ 527.8, subds. (c), (k)(1).)

A trial court's "decision to grant a permanent injunction rests within its sound discretion and will not be disturbed on appeal absent a showing of a clear abuse of discretion." (*Shapiro v. San Diego City Council* (2002) 96 Cal.App.4th 904, 912.) When the trial court resolves disputed factual issues, and draws inferences from the presented facts, an appellate court reviews the factual findings under a substantial evidence standard. (*Ibid.*; *USS-Posco*, *supra*, 111 Cal.App.4th at p. 444.)

## II. *Sufficiency of the Evidence Challenge*

Dr. Young contends there was insufficient evidence to support the court's findings that Tri-City met its burden to show he committed violence or made a credible threat of violence supporting the issuance of a section 527.8 restraining order.

Before issuing a protective order under section 527.8, a court must find by clear and convincing evidence the defendant has committed violence or has made a "credible threat of violence." (§ 527.8, subd. (j).) A "[c]redible threat of violence" is a knowing and willful statement or course of conduct that would place a reasonable person in fear for his or her safety, or the safety of his or her immediate family, and that serves no legitimate purpose. (§ 527.8, subd. (b)(2).) " 'Course of conduct' is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an employee to or from the place of work; entering the workplace; following an employee during the hours of employment; making

16

telephone calls to an employee; or sending correspondence to an employee . . . ." (§ 527.8, subd. (b)(1).)

In determining whether substantial evidence supports a section 527.8 finding, we must "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630; see *USS-Posco*, *supra*, 111 Cal.App.4th at p. 444.) "It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment." (*Howard*, *supra*, 72 Cal.App.4th at pp. 630-631.) If substantial evidence is present, "no matter how slight it may appear in comparison with the contradictory evidence, the judgment must be upheld. As a general rule, therefore, we will look only at the evidence and reasonable inferences supporting the successful party, and disregard the contrary showing." (*Id*. at p. 631.)

Under these legal principles, we conclude the court's findings were supported. The record contains evidence showing Dr. Young made numerous statements that can be reasonably interpreted as a knowing or willful statement of threatened violent conduct, and that he engaged in a pattern of conduct that can be reasonably interpreted as reflecting an intent to communicate these threats to the employees.

The evidence showed that Dr. Young was extremely angry and upset about the revocation of his medical privileges at the Hospital, and that he blamed various Tri-City

17

employees about this incident, including (in various ways) the four employees for whom Tri-City was seeking protection. Additionally, Dr. Young displayed impulse control problems, "explosive" behavior, and an increasing inability to contain his anger at recent Board meetings. In particular he had made various statements about bringing weapons to the Hospital and claimed to know people who own weapons.

With respect to Soskins, Dr. Young invaded his personal space and stared at Soskins in the Board meeting room, followed him into the restroom, physically touched Soskins, berated him, and told him "he was going to get him." Soskins's only prior contact with Dr. Young was that Soskins was a former attorney for the law firm that represented Tri-City in Dr. Young's mandate action. Based on Dr. Young's conduct, Soskins was extremely fearful of Dr. Young and was concerned about Young committing a violent act against him.

With respect to Piearson, Dr. Young had a long history of harassing conduct and had made comments suggesting that he knew where Piearson lived, where she parked, and the color of her car. Piearson was required to attend Board meetings that were also attended by Dr. Young and expressed substantial concern for her personal safety.

With respect to Anderson and Coulter, at an August 2010 board meeting, Dr. Young acted in a threatening manner (both verbally and physically) towards both Board members, and during the confrontation said something to the effect of "Maybe I'll bring a gun." Both testified they were highly concerned for their physical safety when Dr. Young was in proximity.

18

Security director Lawyer, who testified as an expert, said that he was substantially concerned Dr. Young would act out in a violent way toward the four employees. He opined that Dr. Young's actions fit within the paradigm of a perpetrator of workplace violence, including Dr. Young's moving into people's safety zones, aggressive posturing, verbal intimidation, hostility, impulse control issues, decline in personal appearance, and repeated reference to weapons.

Additionally, the evidence at the hearing showed that Dr. Young was not willing to follow directions or listen to authority, and that Dr. Young continued to display uncontrolled anger, including forcefully hitting his fist into his hand when he passed Anderson during a break.

Based on all of the evidence, the court found Dr. Young's course of conduct and statements constituted threats of violence towards the four employees and these threats placed the employees in reasonable fear of their safety. The court specifically noted that Dr. Young presented "real safety concern issues," because of his repeated references to knives and other weapons and emphasized the continued manifestations of Dr. Young's inability to control his anger. Substantial evidence supported the court's findings.

In his appellate briefs, Dr. Young discusses facts supporting a conclusion that his statements did not constitute threats of physical violence and instead he was merely intending to communicate his disregard for the actions, ethics, morals, and honesty of the various Hospital employees. For example, Dr. Young states that his "alleged rant" to Soskins during a Board meeting was not a threat of physical violence and instead he was merely telling Soskins "that he was a liar who was going to be caught in his lies."

19

However, the trial court rejected this interpretation of the facts, and concluded that Dr. Young's statements and actions reflected credible threats of violence. In challenging this conclusion, Dr. Young is essentially requesting that we reweigh the evidence and make different inferences than did the trial court. Under well-settled appellate principles, we have no authority to do so. (See *Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660; *In re H. G.* (2006) 146 Cal.App.4th 1, 13.) We cannot substitute our deductions for those of the trial court if they are reasonable and supported by substantial evidence. (*Ibid.*) The trial court's conclusions were reasonable and were supported by substantial evidence.

Relying on four decisions in which section 527.8 injunctions were upheld, Dr. Young argues that his conduct did not arise to the level of violent conduct or threats of violent conduct. (*City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526; *USS-Posco, supra*, 111 Cal.App.4th 436; *Huntingdon Life*, *supra*, 129 Cal.App.4th 1228; *City of Palo Alto v. Service Employees International Union* (1999) 77 Cal.App.4th 327.) There is nothing in any of those decisions suggesting the trial court erred in ordering the injunctions against Dr. Young.

To the contrary, these decisions support the court's conclusions in this case. For example, in *USS-Posco*, the appellant argued that he was well known as a " 'trash talker' " and should not be taken seriously, especially because he had no history of violent conduct. (*USS-Posco*, *supra*, 11 Cal.App.4th at pp. 441, 444-445.) The court rejected this argument based on evidence showing the appellant repeatedly threatened to bring a gun into work and shoot people. (*Id.* at pp. 444-445.) Although Dr. Young did not directly threaten to shoot anyone, he did repeatedly discuss bringing weapons into the

20

Hospital and there was evidence that he had previously threatened the lives of various Hospital officials.

Dr. Young contends the court erred in relying on the pre-2010 events. He asserts that his prior statements and conduct were insufficient to establish a current threat because they were "isolated remarks" and "remote in time." However, the court specifically recognized that some of the events were "dated," but found they showed a "consistent pattern" of inappropriate threatening behavior that had escalated during the past year. The court's conclusion was reasonable. The pre-2010 events were relevant to explain Dr. Young's current conduct and the fact that he had a long-standing resentment and inability to control his anger against Hospital officials. (See *Huntingdon Life*, *supra*, 129 Cal.App.4th at p. 1250 [" 'context is critical in a true threats case and history can give meaning to the medium' "].)

In a related argument Dr. Young contends the protective order regarding Piearson was unwarranted because there was no specific evidence that Dr. Young had contact with Piearson after his privileges were terminated in 2009. However, Piearson testified that in her current position she was required to attend many Board meetings and she remained frightened of Dr. Young based on his increasingly aggressive conduct at the meetings and his prior statements that he knew where she parked and lived. The court—which had the full opportunity to observe Dr. Young's demeanor and consider Dr. Young's statements under the totality of the circumstances—found Dr. Young's statements continued to reflect a current threat to Piearson. An employer subjected to generalized threats of workplace violence may obtain relief under section 527.8 on behalf of an employee who

21

is a logical target of the threats.  (*USS-Posco*, *supra*, 111 Cal.App.4th at p. 436.)  The court did not abuse its discretion in concluding Piearson remained a potentially targeted employee.

Dr. Young also devotes large portions of his brief to discussing the lack of evidence showing he had actually committed violent acts, i.e., an assault, battery, or stalking.  (§ 527.8, subd. (b)(7).)  However, section 527.8 permits a court to issue a restraining order based on evidence the defendant "engaged in unlawful violence *or* made a credible threat of violence."  (§ 527.8, subd. (j), italics added.)  Because there was substantial evidence to support the court's finding that Dr. Young made credible threats of violence, we need not address the issue whether Dr. Young had in fact engaged in unlawful violence within the meaning of section 527.8, subdivision (b)(7).

Dr. Young also argues there was no evidence that he made a credible threat "with the *intent* to place [a] person in reasonable fear for his or her safety, or the safety of his or her immediate family" or that he had the "apparent ability to carry out the threat." However, as this court has stated, " '[i]t is not necessary that the defendant intend to, or be able to carry out his threat; the only intent requirement for a true threat is that the defendant intentionally or knowingly communicate the threat.' " (*Huntingdon Life*, *supra*, 129 Cal.App.4th at p. 1256 [upholding denial of anti-SLAPP motion because plaintiff had a probability of prevailing on lawsuit seeking injunction under sections 527.6 and 527.8]; accord *City of San Jose v. Garbett*, *supra*, 190 Cal.App.4th at p. 539 ["[T]he Legislature unequivocally dispensed with the requirement [in section 527.8] that the defendant intend to cause the person to believe that he or she had been threatened

22

with death or serious injury.  It currently requires only a statement made knowingly and willfully, which would place a reasonable person in fear for his or her safety."].)

We also reject Dr. Young's argument that the court inappropriately based its factual conclusions on Dr. Young's failure to comply with the court's procedural rules and/or the "fist-pumping" incident.  This evidence was relevant to the issue of whether Dr. Young was willing and able to control his emotions in structured situations. Moreover, the record shows the court did not rely solely on these facts to reach its conclusions and instead the court considered all of the testimony and documentary evidence before issuing the protective orders.

Substantial evidence supported the court's factual findings that Dr. Young made credible threats of violence and thus the four employees were in need of protection.

### III.  *Court Applied Correct Standards*

Dr. Young next contends the court erred by applying incorrect legal standards. Specifically, Dr. Young argues the court erred because it failed to apply the "clear and convincing" proof standard and issued the injunctions solely to "stop harassment" rather than to prevent "violence."  These arguments are without merit.

With respect to the "clear and convincing" proof standard, the court did not expressly state these words when explaining its findings, but the record shows the court was aware Tri-City was seeking a protective order under section 527.8, which expressly requires "clear and convincing" proof of violence or threats of violence.  (§ 527.8, subd. (j).)  Absent any indication to the contrary, we are required to presume that a judicial officer has " ' "regularly performed" ' " its duties and " 'applied the correct standard of

23

proof.' " (*Saraswati v. County of San Diego* (2011) 202 Cal.App.4th 917, 929; see

*Consaul v. City of San Diego* (1992) 6 Cal.App.4th 1781, 1792.)

Dr. Young argues that the court did not apply the correct proof burden because in its minute order the court said that "credible evidence" established Dr. Young's "escalation" of improper conduct during Board meetings. This statement does not reasonably reflect that the court misunderstood or misapplied the proof burden. A reference to the credibility of evidence concerns whether the court found the evidence believable or trustworthy, not the particular proof burden that it employed to reach its determinations.

For similar reasons, we reject Dr. Young's argument that the court erroneously believed section 527.8 protective orders could be issued based solely on harassing conduct without evidence of violence or threatened violence. The central focus of the section 527.8 hearing was on the issue whether Dr. Young presented a threat of physical violence to the four employees. Each of the four employees testified about implied or express threats of violence, and each of these employees expressed substantial concern for their physical safety when around Dr. Young. Consistent with this evidence, at the outset of his closing argument, Tri-City's counsel stated that "either unlawful violence or a credible threat of violence" is required for the court to grant the petition and discussed the meaning of a "credible threat of violence" and "a course of conduct." In reaching its conclusions, the court stated it had "real safety concern issues" with Dr. Young's conduct, including his repeated references to weapons and the repeated need for security to escort him off the premises. In its final order, the court also highlighted the evidence showing

24

that Dr. Young engaged in physically threatening conduct involving "personal touching, stalking around the hearing room, confrontations in the restrooms, and discussions as having/obtaining weapons." The court also repeatedly referred to Dr. Young's "fist pounding" in explaining its decision to issue the protective order.

Reviewing the entire record, we are satisfied the court understood that Tri-City was required to prove Dr. Young engaged in unlawful violence or made a credible threat of violence, and that mere harassment without violence or a threat of violence was insufficient to satisfy this standard.

IV. *Dr. Young's Contention that Tri-City Sought Injunctions for Improper Purposes*

Dr. Young contends the protective orders must be vacated because Tri-City sought the injunctions merely to "stifle" his free speech rights. He argues, for example, that "what [Tri-City] characterized as [his] violent behavior was actually his advocacy in favor of [another Board member]." However, the court rejected these arguments, and found Dr. Young's statements and conduct constituted credible threats of violence, and did not reflect merely Dr. Young's attempts to fairly advocate for his viewpoints. As discussed above, the record supports the court's conclusion.

Dr. Young alternatively argues the injunction was improper because Tri-City sought the injunction merely to get "a leg up in Dr. Young's contemporaneous mandate action against it." In support, he discusses actions taken by Tri-City in the mandate proceedings. However, the court rejected Dr. Young's arguments that Tri-City brought the section 527.8 petitions merely to influence the court's decision in the mandate action. The court had ample evidentiary grounds for reaching this conclusion. The court also

cautioned Tri-City not to use its findings in proving its claims in the mandate proceedings. Even assuming Tri-City failed to comply with this admonition, this action does not show the court erred in issuing the section 527.8 restraining orders.

### V. *First Amendment Rights*

Dr. Young also contends the court's protective orders violated his First Amendment rights because he was not permitted to be personally present at public Board meetings.

Section 527.8 states that a court is not "permit[ted] . . . to issue [an] injunction prohibiting speech or other activities that are constitutionally protected . . . ." (§ 527.8, subd. (c).) However, "[t]he right to free speech is not absolute or unlimited." (*City of San Jose v. Garbett*, *supra*, 190 Cal.App.4th at p. 536.) " '[O]nce a court has found that a specific pattern of speech is unlawful, an injunctive order prohibiting the repetition, perpetuation, or continuation of that practice is not a prohibited 'prior restraint' of speech.' " (*Id.* at p. 537.) The courts have thus held that "if the elements of section 527.8 are met by the expression of a credible threat of violence toward an employee, then that speech is not constitutionally protected and an injunction is appropriate." (*Ibid.*)

Under the court's order, Dr. Young retains the full opportunity to speak to the Board under the established public comment period and to listen to entire Board meetings through a telephone system. Although Dr. Young's right to communicate through gestures or body language, assert comments outside the established comment period, and/or see the facial expressions of the Board members have been limited, these limitations are fully justified by the need to protect the four employees from Dr. Young's

26

credible threats of violence.  In light of his conduct, the fact that Dr. Young cannot attend those meetings *in person* does not establish a constitutional violation.

DISPOSITION

Affirmed.  Appellant to bear respondent's costs on appeal.


HALLER, J.

WE CONCUR:


McCONNELL, P. J.


McDONALD, J.