Filed 4/11/13  Glaser v. Meserve CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| PAUL MICHAEL GLASER, | B240385 |
| Plaintiff and Respondent, | |
| v. | (Los Angeles County Super. Ct. No. SS021888) |
| PAMELA MESERVE, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County.  Lisa Hart Cole, Judge.  Affirmed.

Winston & Strawn, Marcus T. Hall, Craig C. Crockett; Novak Druce Connolly Bove + Quigg and Marcus T. Hall for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\* \* \* \* \* \*

Plaintiff and respondent Paul Michael Glaser (Glaser) sought and obtained a six-month civil harassment restraining order pursuant to Code of Civil Procedure section 527.6[1] against defendant and appellant Pamela Meserve. When the order expired and appellant resumed her harassment, Glaser sought and obtained a three-year injunction and appellant appealed the second order.

We affirm. Substantial evidence supported the issuance of the order under section 527.6. Moreover, the trial court imposed no verbal limitations on the written order and the order's firearms restrictions do not violate the Second Amendment to the United States Constitution.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Parties and Their Relationship.

Glaser was an actor on the 1970's television show Starsky and Hutch. Following the show, he became a director and later an author.

Sometime in 2000, appellant approached Glaser to see if he was interested in a Web site she had developed for him, and he agreed that she could maintain it. Over time, he communicated with her about the Web site, seeking her assistance in handling fan mail. She also began sending gifts to Glaser. Appellant was living in the Boston area and Glaser thanked her for the gifts by telephone, thinking of her as a passionate fan.

In 2008, appellant flew to London to see Glaser in a play and attended over 20 performances. Also in 2008, appellant moved from Boston to the same Venice neighborhood to which Glaser had recently relocated. She constantly appeared in front of his apartment, and though Glaser's children questioned her behavior, Glaser tried to remain friendly with her.

At about the same time, Glaser decided to self-publish his first book, *Chrystallia*, and asked appellant for her assistance. As early as 2007, appellant had been providing

---

[1]     Unless otherwise indicated, all further statutory references are to the Code of Civil Procedure.

Glaser with editorial comments on the book. Glaser offered to compensate appellant for her time on publishing, and according to appellant, she was to receive five percent of the royalties generated from book sales. According to Glaser, after working with appellant for approximately six to nine months, he realized that his self-publishing efforts were not going to work. He retained professionals, who after two meetings with appellant said they would be unable to work with her, as her behavior disturbed them. Glaser terminated her, but told her he would compensate her for her time once the book made a profit.

Appellant continued to contact Glaser and his friends and colleagues, and ultimately moved in with Glaser's next-door neighbor. She would sit on the stairs opposite Glaser's kitchen door while working on her computer. And at some point she lived only in her car, parked near Glaser's home.

By early 2011, Glaser's e-mail communications to appellant were focused on efforts to get control of the Web sites that she had been managing, offering to pay her for the rights, while appellant's e-mails were focused on efforts to mend the parties' relationship.

### *First Restraining Order.*

Glaser applied for a civil harassment restraining order on April 15, 2011. He sought the order on the grounds appellant had been continuously lurking near his home, following him and excessively e-mailing him. In an attached letter submitted in support of the application, Glaser explained that appellant "exhibits both a rational and very irrational side and has continued to impose herself on me and my life despite my requests for her to desist." Appellant objected to the application and wrote a letter to the court in opposition, attaching two letters of recommendation from Glaser and a number of e-mail exchanges between Glaser and her.

At a May 5, 2011 hearing, Glaser testified about his concerns with appellant's behavior, explaining that after he terminated her, she kept showing up in his neighborhood and approaching visitors to his home, sometimes leaving notes on their cars and sometimes pleading her case in person. He was also concerned that appellant

3

had moved into the apartment just behind his, despite his requests to stay away. He stated that although appellant had not made any threats that would lead him to fear for his physical safety, he did fear for his safety as a result of her irrational behavior. The trial court issued a restraining order, effective for six months. The order required appellant to refrain from harassing, threatening, following or stalking Glaser, and directed that she not contact him by telephone, message, mail or e-mail. The order further required her to stay at least 20 feet away from Glaser and his home and vehicle. It also contained provisions preventing appellant from owning, possessing or purchasing a firearm, and requiring her to turn in any firearm in her possession or control. Appellant did not challenge the order on appeal.

### *Second Restraining Order.*

While the first restraining order was in effect, appellant contacted Glaser's business associates about postings on Glaser's Web site. Once the order expired, she immediately began contacting Glaser via e-mail; she expressed concern about certain Internet postings but primarily expressed her desire to reconcile with him. For example, part of a January 2012 e-mail stated: "Do we have to wait until our next life to really see that we are here right NOW, in this moment for each other? (read: friendship . . . learning/teaching . . . etc.)"

Glaser applied for a second civil harassment restraining order on January 25, 2012. He asserted that appellant had resumed calling him and e-mailing him constantly; that she walked where he was walking, sometimes circling back just to interact with him; and that she blogged on his Facebook and Twitter accounts, representing herself as his "liaison." He attached some of her recent e-mails. He sought a three-year restraining order and asked that appellant be ordered to keep at least 100 yards away from him, his family and certain business colleagues.

Appellant objected to the order and denied that there was a factual basis for it. She attached copies of many e-mail exchanges—most between her and Glaser during 2007 and 2009, as well as copies of her marketing plan for *Chrystallia*.

4

Appellant and Glaser testified at a February 8, 2012 hearing. At that point, appellant still lived in Glaser's neighborhood in an apartment about 400 yards from his apartment. Glaser testified that although he asked appellant to leave him alone, "she continues to call me, e-mail me, repeating, repeating constantly to read the e-mails. It's kind of bizarre. It's like, you know, 'I'll never stop. I'll never stop e-mailing you no matter what. And I will do this because this is my calling. This is what I'm about.'" Appellant offered various explanations for each time she contacted or attempted to contact Glaser and his family and friends. She denied she was pursuing him.

At the conclusion of the hearing, the trial court issued a three-year restraining order. It commented that appellant had contacted Glaser excessively, even after he asked her not to, and it understood why Glaser was concerned. The trial court stated to appellant: "Even though you yourself may not appreciate how your conduct appears to others, I will tell you from an objective point of view, it appears excessive. And I am concerned with the fact that you specifically started when the first restraining order ended and you stopped as soon as you were served with this. So even though you say you can control yourself, I'm not confident that you can."

The trial court declined to issue the restraining order in favor of any third parties in the absence of any direct evidence from them. It explained the scope of the order to appellant, describing how the order prevented her from contacting Glaser directly or indirectly, either in person, by telephone, by any electronic communication or through social media. It limited the order to a 25-yard distance, explaining to appellant: "You are ordered to stay 25 yards away from him. And you obviously can walk on your street. But if you see him, you're not allowed to approach him. You need to turn in the other direction. And if your goal is exercise for you and the dogs, then I'm sure you'll appreciate that this is not a cumbersome thing to do. You are not to be walking in front of his house over and over. You can pass it once. But you can't repeatedly hang around within 25 yards of him or his home, his job, or his workplace, or his car, or his vehicle. This does not prevent you from going to or from your home or place of employment. And that will be the extent of the order."

5

This appeal followed.

## DISCUSSION

Appellant challenges the restraining order on the grounds it was not supported by substantial evidence, it failed to include certain limitations ordered by the trial court and its firearms restrictions violated the Second Amendment. Each challenge lacks merit.

## I. Substantial Evidence Supported the Restraining Order Entered by the Trial Court.

### A. *Applicable Legal Principles and Standard of Review.*

Section 527.6 authorizes a natural person who has suffered "harassment" to obtain a restraining order and injunction prohibiting further harassment. The statute was designed to supplement existing law by providing an expedited procedure to harassment victims and was "enacted to protect the individual's right to pursue safety, happiness and privacy as guaranteed by the California Constitution. [Citations.]" (*Grant v. Clampitt* (1997) 56 Cal.App.4th 586, 591.)

Subdivision (b)(3) of section 527.6 defines "harassment" as "unlawful violence, a credible threat of violence, or a knowing and willful course of conduct directed at a specific person that seriously alarms, annoys, or harasses the person, and that serves no legitimate purpose. The course of conduct must be such as would cause a reasonable person to suffer substantial emotional distress, and must actually cause substantial emotional distress to the petitioner." Subdivision (b)(1) defines "course of conduct" as "a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose, including following or stalking an individual, . . . or sending harassing correspondence to an individual by any means . . . ." (§ 527.6, subd. (b)(1).)

After the party sought to be enjoined has had notice and an opportunity to respond to a petition seeking an injunction, the trial court must hold an evidentiary hearing to receive relevant testimony "and may make an independent inquiry." (§ 527.6, subd. (i).)

6

"If the judge finds by clear and convincing evidence that unlawful harassment exists, an injunction shall issue prohibiting the harassment." (*Ibid.*)

On appeal from an injunction prohibiting harassment under section 527.6, "we review the evidence before the trial court in accordance with the customary rules of appellate review. We resolve all factual conflicts and questions of credibility in favor of the prevailing party and indulge in all legitimate and reasonable inferences to uphold the finding of the trial court if it is supported by substantial evidence which is reasonable, credible and of solid value." (*Schild v. Rubin* (1991) 232 Cal.App.3d 755, 762; accord, *USS-Posco Industries v. Edwards* (2003) 111 Cal.App.4th 436, 444.) The substantial evidence rule applies without regard to the standard of proof required at trial. In other words, the standard of review remains substantial evidence even if the standard below is clear and convincing evidence.[2] (See *Crail v. Blakely* (1973) 8 Cal.3d 744, 750; *In re Marriage of Ruelas* (2007) 154 Cal.App.4th 339, 345; *In re Mark L.* (2001) 94 Cal.App.4th 573, 580–581.)

## B.  The Evidence Satisfied the Statutory Requirements Necessary for an Injunction.

In order to support the issuance of an injunction, Glaser was required to show that appellant had engaged in a course of conduct constituting harassment that would both cause a reasonable person and actually caused him to suffer substantial emotional distress. (§ 527.6, subd. (b).)

Here, the evidence showed appellant had engaged in a course of conduct that both annoyed and harassed Glaser, and served no legitimate purpose. Even assuming that appellant had a legitimate basis to contact Glaser while she was working with him on his book, the evidence showed that by January 2011 the parties no longer had a working relationship. Nonetheless, appellant continued to e-mail and call Glaser, to walk by his

---

[2]  We reject appellant's assertion–renewed at oral argument–that a de novo standard of review applies here. In view of the disputed evidence and the conflicting inferences to be drawn therefrom, we review the trial court's order for substantial evidence. (See *R.D. v. P.M.* (2011) 202 Cal.App.4th 181, 193–194.)

home and to approach him in person, even though he told her he wanted nothing to do with her. There was sufficient evidence to show that her contact had no legitimate purpose. For example, in a January 2011 e-mail appellant wrote: "I am NOT letting GO. I AM NOT forget[t]ing and I will not let YOU forget either . . . no sir . . . no more BS from you. I LOVED YOU. It is not a terrible thing!" In April 2011 appellant wrote: "I loved you Paul . . . I trusted and believed everything, every word you shared and promised me . . . I can't let go or forget that. Why can't you understand this? I need to know why!" And after the first restraining order expired, appellant wrote in a January 2012 e-mail, "Paul . . . don't you think that maybe fate brought us together? Or maybe in our next life, when we meet again, we will really know that the reason we ARE here IS to help each other . . . to appreciate the gift of each other, what we can learn from each other and teach [each] other with open kindness, understanding and compassion . . . ."

The evidence was likewise sufficient to show that appellant's harassment would cause a reasonable person to suffer substantial emotional distress. Appellant's conduct was akin to that of the defendant in *R.D. v. P.M., supra,* 202 Cal.App.4th 181. There, the court found substantial evidence supported the conclusion that a reasonable person would have suffered substantial emotional distress as a result of the defendant's unwanted contacts with the plaintiff spanning almost one year. (*Id*. at p. 189.) The defendant, a former patient of the plaintiff therapist, engaged in conduct including confronting the plaintiff at a local market, posting negative consumer reviews on the Internet and distributing flyers with disparaging messages about the plaintiff, and engaging in volunteer activities at the plaintiff's children's schools. (*Id*. at pp. 183, 189.) Here, beyond her unwanted contact with Glaser, appellant similarly blogged on Glaser's Facebook and Twitter Web sites, contacted his children and volunteered for a foundation he founded on behalf of his deceased wife. Correspondingly, this evidence supported the conclusion that Glaser had suffered substantial emotional distress. (See *Ensworth v. Mullvain* (1990) 224 Cal.App.3d 1105, 1110–1111 ["the record contains sufficient evidence of Mullvain's harassment of Ensworth to allow the trial court to draw the conclusion that Ensworth indeed had suffered substantial emotional distress"].)

8

Appellant summarily contends that her conduct did not amount to actionable harassment, citing a series of cases she characterizes as involving conduct more egregious than hers. (See, e.g., *Kobey v. Morton* (1991) 228 Cal.App.3d 1055, 1057 [evidence of harassment included the defendant's threatening violence and a lawsuit, falsely accusing the plaintiff of having AIDS and threatening the plaintiff's family members]; *Elster v. Friedman* (1989) 211 Cal.App.3d 1439, 1441 [evidence of harassment included the defendants' disturbing the plaintiffs by playing excessively loud music, making meritless complaints to animal regulation officials, parking in unauthorized spaces and stealing the plaintiffs' bicycles].) But the only way in which appellant has been able to draw a distinction between her conduct and the harassment involved in the foregoing cases is by reciting the evidence in a light most favorable to her position. She ignores the well-established principle that "[a] reviewing court must view the evidence in the light most favorable to the party prevailing below. [Citation.]" (*Harland v. State of California* (1977) 75 Cal.App.3d 475, 482.) Properly viewed, evidence concerning appellant's consistent, repeated and unwanted contact of Glaser showed a continuing course of harassment.

Appellant next contends there was insufficient evidence to show that her actions caused substantial emotional distress, either objectively or subjectively. "[E]motional distress" is generally understood to include, among other emotions, fright, nervousness, anxiety, humiliation and worry. (See *Thing v. La Chusa* (1989) 48 Cal.3d 644, 648–649.) "Section 527.6 does not define the phrase 'substantial emotional distress.' However, in the analogous context of the tort of intentional infliction of emotional distress, the similar phrase 'severe emotional distress' means highly unpleasant mental suffering or anguish 'from socially unacceptable conduct' [citation], which entails such intense, enduring and nontrivial emotional distress that 'no reasonable [person] in a civilized society should be expected to endure it.' [Citations.]" (*Schild v. Rubin, supra*, 232 Cal.App.3d at pp. 762–763.)

Expressly stating that it considered appellant's conduct from an "objective" point of view, the trial court explained to appellant that she had "really gone overboard and

9

beyond the pale. And I understand why Mr. Glaser is concerned." Substantial evidence supported the trial court's conclusion that Glaser should not have been expected to endure appellant's excessive and accusatory e-mails, unwanted personal contact and irrational behavior. We reject appellant's contention that *Brekke v. Wills* (2005) 125 Cal.App.4th 1400 shows Glaser's evidence was insufficient. There, the defendant, a teenage boy, wrote a series of "vile and vitriolic letters" to his girlfriend, the plaintiff's teenage daughter, that included significant profanity and threats of violence directed toward the plaintiff. (*Id*. at pp. 1405–1406, 1413.) The court concluded that "[w]ithout doubt, defendant's socially unacceptable course of conduct would have seriously alarmed, annoyed, or harassed a reasonable person, and would have caused a reasonable person to suffer substantial emotional distress." (*Id*. at p. 1414.) While appellant's e-mails were not as profane or threatening as the letters in *Brekke*, appellant's conduct far exceeded what has been held inadequate to cause a reasonable person to suffer substantial emotional distress. For example, in *Schild v. Rubin, supra*, 232 Cal.App.3d at page 763, the court held that the objective standard was not satisfied by evidence that noise created by neighboring children playing basketball for up to 30 minutes in their backyard interrupted the plaintiffs' weekend naps "and, in general, interfered with their ability to rest and relax in their own home." (*Id*. at pp. 758, 763.) Appellant's behavior was unlike nearby basketball playing found to cause only "transitory emotional distress [as] the natural consequence of living among other people in an urban or suburban environment" (*id*. at p. 763) and more akin to the "socially unacceptable course of conduct" found to cause a reasonable person to suffer substantial emotional distress (*Brekke v. Wills, supra,* at p. 1414).

Substantial evidence also showed that Glaser suffered substantial emotional distress. Evidence satisfying the subjective prong of section 527.6 may be circumstantial. (*Ensworth v. Mullvain, supra,* 224 Cal.App.3d at pp. 1110–1111.) In upholding an injunction under section 527.6, the *Ensworth* court rejected the proposition that direct testimony is required to establish that a plaintiff actually suffered substantial emotional distress; it found sufficient the plaintiff's testimony that the defendant followed and spied

on her, repeatedly drove around her house, made numerous phone calls and sent threatening letters, and contacted other professionals in the community in an effort to harm the plaintiff's reputation. (*Ensworth v. Mullvain, supra,* at pp. 1108, 1110–1111.) Here, in addition to testifying about evidence of appellant's conduct, Glaser testified at the first hearing that he had gotten to the point where he could not control or manage appellant's behavior and that, because of her irrational behavior, "I fear for my safety." At the second hearing, he reiterated that he did not believe appellant was able to stop herself from contacting him, and he felt as if he were being pursued. He worried that if appellant was incessantly e-mailing, calling and approaching him, he did not know whether she was capable of more. Any further evidence on the point would have been cumulative. (*Id.* at p. 1111 [finding the plaintiff's direct testimony concerning emotional distress would have been cumulative in view of testimony about the defendant's conduct and declaratory evidence that the plaintiff suffered emotional distress].)

Appellant lastly argues that there was insufficient evidence of a threat of continued harassing conduct warranting the injunction against potential future misconduct. (See *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 401 ["a prohibitory injunction necessarily addresses future conduct"]; *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, 332 [injunctive relief should not "be exercised in the absence of any evidence establishing the reasonable probability the acts will be repeated in the future"].) Here, the evidence plainly showed and the trial court expressly found that appellant's behavior was likely to continue in the absence of an injunction. Appellant immediately resumed her harassment of Glaser when the first injunction expired. Toward the end of the hearing, when appellant was objecting to the issuance of the injunction, the trial court repeatedly pointed out that appellant had demonstrated she was unable to control herself in the absence of a court order. In one comment, the trial court stated: "I'm satisfied based on the evidence that I've seen, specifically the extensive number of e-mails that you've sent that stop specifically when the notice of this restraining order was given. I really don't think you can control yourself." There was substantial evidence that the injunction was reasonably necessary to address future conduct.

11

### C.     The Injunction Did Not Contain Any "Softening Limitations."

At the end of the hearing, the trial court explained to appellant some of things she could and could not do under the injunction. It explained that the 25-yard distance would permit appellant to walk her dogs and pass by Glaser's home. On the other hand, she would not be allowed to loiter in front of Glaser's home or any other place he might frequent, or to approach him should she encounter him on the street.

Appellant attempts to characterize the trial court's comments as "softening limitations" on the injunction, erroneously excluded from the order itself. We decline to consider the trial court's comments as anything more than a description of the order that was entered, requiring appellant to stay 25 yards away from Glaser. *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443 is instructive. There, the court rejected efforts to give significance to comments the trial court made when denying a preliminary injunction, reasoning: "Because we review the correctness of the order, and not the court's reasons, we will not consider the court's oral comments or use them to undermine the order ultimately entered. [Citations.] Here, where the trial court was not required to prepare a statement of decision or explain its reasons for denying the injunction, it is especially important to refrain from using the court's oral comments as a basis for reversal." (*Id.* at p. 1451.)

Construing the trial court's comments as limiting the scope of the injunction would serve to undermine the trial court's order. Glaser sought an order that appellant stay 100 yards away from him and his family members and business associates. The trial court entered a much narrower order, requiring that appellant stay 25 yards from Glaser only. Its comments indicated that the 25-yard distance would enable appellant to continue to walk on her street and to otherwise travel to and from her home or workplace. Interpreting the trial court's comments as a basis for modifying its written order "would in effect require the trial court either to prepare a statement of decision where none is required or to say nothing during argument to avoid creating grounds for impeaching the final order. We decline to place the trial courts in such an untenable position." (*Whyte v. Schlage Lock Co., supra,* 101 Cal.App.4th at p. 1451.)

**II.     Appellant Waived Any Constitutional Challenge to the Firearms Restrictions by Not Raising the Issue Below, and, in Any Event, Her Challenge Lacks Merit.**

Though appellant did not challenge the injunction on this basis in the trial court, she now contends that the injunction's firearms restrictions violate the Second Amendment to the United States Constitution.  As a threshold matter, we conclude that she waived the issue by failing to raise it below.  "'"Typically, constitutional issues not raised in earlier civil proceedings are waived on appeal."'  [Citations.]" (*Neil S. v. Mary L.* (2011) 199 Cal.App.4th 240, 254; accord, *Hepner v. Franchise Tax Bd.* (1997) 52 Cal.App.4th 1475, 1486 ["In civil cases, constitutional questions not raised in the trial court are considered waived"]; *In re Tania S.* (1992) 5 Cal.App.4th 728, 735 [explaining that appellate courts ordinarily do not consider matter raised for the first time on appeal, including constitutional issues].)  Nonetheless, even if we were to characterize appellant's constitutional challenge as a question of law and exercise our discretion to consider it (see *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1, 5), we would find no Second Amendment violation.

Anyone subject to an injunction under section 527.6 is subject to mandatory firearms restrictions which prevent the enjoined person from purchasing, owning or possessing a firearm and requiring that person to relinquish any firearms then owned or possessed.  (§ 527.6, subds. (t)(1) & (t)(2).)[3]  Appellant argues that her right to bear arms under the Second Amendment is infringed on by these restrictions.

---

[3]     Section 527.6, subdivision (t) provides:  "(1) A person subject to a protective order issued under this section shall not own, possess, purchase, receive, or attempt to purchase or receive a firearm or ammunition while the protective order is in effect.  [¶]  (2) The court shall order a person subject to a protective order issued under this section to relinquish any firearms he or she owns or possesses pursuant to Section 527.9.  [¶] (3) Every person who owns, possesses, purchases, or receives, or attempts to purchase or receive, a firearm or ammunition while the protective order is in effect is punishable pursuant to Section 29825 of the Penal Code."

The Second Amendment to the United States Constitution provides: "A well regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed." In *District of Columbia v. Heller* (2008) 554 U.S. 570 (*Heller*), the United States Supreme Court struck down Washington D.C.'s ban on handgun registration on the ground that the Second Amendment protects an individual's right to possess firearms. (See also *McDonald v. City of Chicago* (2010) __ U.S. __ [130 S.Ct. 3020, 3026] [finding the Second Amendment right recognized in *Heller* "is fully applicable to the States"].) Though appellant argues that her right to possess firearms should be similarly protected, we disagree.

"Although it struck down the District of Columbia handguns ban, *Heller* recognized and affirmed certain traditional limitations on the right to bear arms," and "identified an expressly *nonexclusive* list of 'presumptively lawful regulatory measures,' stating 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions [a]nd qualifications on the commercial sale of arms.' [Citations]." (*People v. Delacy* (2011) 192 Cal.App.4th 1481, 1487–1488, italics added [upholding constitutionality of Pen. Code, § 12021, subd. (c)(1), which prohibits possession of firearms by persons convicted of specified misdemeanors].)

We construe the firearms restrictions in section 527.6 as "analogous to a prohibition on felon weapon possession, a type of restriction expressly listed by *Heller* as untouched by its holding." (*People v. Delacy, supra*, 192 Cal.App.4th at p. 1489.) We are also guided by the myriad cases applying an intermediate level of scrutiny to uphold Title 18 United States Code section 922(g)(8), a statute which criminalizes possession of firearms and ammunition by persons subject to a domestic violence injunction. (E.g., *United States v. Mahin* (4th Cir. 2012) 668 F.3d 119, 123–125 [collecting cases]; *U.S. v. Lippman* (8th Cir. 2004) 369 F.3d 1039, 1044 ["No circuit court which has addressed the question has found § 922(g)(8) unconstitutional under the Second Amendment"].) As explained in *U.S. v. Emerson* (5th Cir. 2001) 270 F.3d 203, 261, while "the Second

Amendment *does* protect individual rights, that does not mean that those rights may never be made subject to any limited, narrowly tailored specific exceptions or restrictions for particular cases that are reasonable and not inconsistent with the right of Americans generally to individually keep and bear their private arms as historically understood in this country."

Accordingly, were we to reach the issue, we would conclude that the firearms restrictions in section 527.6 do not run afoul of the Second Amendment.

## DISPOSITION

The civil harassment restraining order is affirmed.  Parties to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.*

FERNS

We concur:

_____, P. J.

BOREN

_____, J.

CHAVEZ

---

\*      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.